DOROTHY BECKER, d. b., *v.* THE STATE OF DELAWARE, p. b.

(*May* 20, 1936.)

LAYTON, C. J., HARRINGTON and RODNEY, J. J., sitting.

*Philip Cohen* for defendant below.

*P. Warren Green,* Attorney-General, *Robert H. Richards, Jr.,* and *C. Edward Duffy,* Deputy Attorneys-General, for the State.

Superior Court for New Castle County, No. 106, January Term, 1936.

LAYTON, C. J., delivering the opinion of the Court:

A preliminary question must be decided. The state insists that the record does not show that the constitutionality of the act was questioned in the court below by motion to quash the information filed, or otherwise, and the question not having been raised there, it cannot be presented here for the first time. And further, it urges that in *certiorari* proceedings the reviewing court is confined to a consideration of the record sent up in obedience to the writ; can hear nothing outside of it to show jurisdiction, regularity, or want of it; that its function is to confine the lower court to cases within its jurisdiction, and to the execution of its powers in the manner prescribed by law; and not to inquire into and decide the merits of the case, if the case has been regularly and fairly tried, for such correction is provided for by appeal. 1 *Woolley Pr.,* § 897.

The last contention is not disputed. In later years this court has adhered rigidly to the rule that it will hear and consider nothing outside of the record. But the argument is not applicable here for the record contains everything

necessary for a determination of the questions presented. The charge preferred against the defendant below appears, of course, from the information filed in the court below, which is a part of the record, and the act, under which the prosecution was had, is sufficiently identified. There is no need, therefore, to supplement the record.

■ A *writ of certiorari* is a writ of error, and the law and practice relative to *writs of certiorari* follow closely the law and procedure incidental to the ordinary proceedings in error. *King's Adm'x v. Hudson's Adm'r, 2 Harr.* 135; 1 *Woolley Pr.*, § 895.

■ Generally, an appellate or reviewing court will not consider any question that was not raised in the court below. This rule, in its general application, rests upon sound reason, and upon some considerations of convenience and necessity, for, if the question had been raised in the lower court, the objection might have been remedied there; and if an objection not raised below may be raised in the reviewing court, there is no assurance of an end to litigation, for new objections may be raised continuously on successive appeals.

But the rule however proper and necessary in most cases is not absolute. There must be some relaxation of the rule if justice is to be something more than an abstraction.

■ The rule gives way when the jurisdiction of the lower court is questioned, 4 *Ency. Pl.* and *Pr.* 295; *Allen v. City of Paterson,* 99 *N. J. Law* 489, 123 *A.* 884; in criminal cases involving fundamental error, 17 *C. J.* 199; where one's rights are dependent upon a statute, *Parsons v. Van Wyck,* 56 *App. Div.* 329, 67 *N. Y. S.* 1054; *State v. Bickford,* 28 *N. D.* 36, 84, 147 *N. W.* 407, *Ann. Cas.* 1916*D,* 140; and

where grave questions of public policy are involved, 3 *C. J.* 742; *Allen v. Paterson, supra.*

*Zuchowski v. State,* 3 *Penn.* 339, 51 *A.* 877, *Anderson et al. v. State,* 3 *Boyce* (26 *Del.*) 157, 82 *A.* 539, and *Repinski v. State,* 6 *Boyce* (29 *Del.*) 21, 96 *A.* 198, arose upon *writs of certiorari* to the municipal court of Wilmington to determine questions of jurisdiction, unconnected, it is true, with the unconstitutionality of statutes. In none of these cases does it appear that the question of jurisdiction was presented to the court below by any appropriate motion or plea, but this court heard and determined the questions apparently raised and presented for the first time.

In *Rash v. Allen,* 1 *Boyce* (24 *Del.*) 444, 76 *A.* 370, the court in banc upheld the issuance of the writ to a municipal corporation which, by virtue of an unconstitutional statute, had assumed to hear and determine an election contest, although the constitutionality of the statute was not, as it appears, questioned before the quasi judicial body which determined the contest.

In *Jeans v. Jeans,* 3 *Harr.* 136, the then Court of Appeals explained the nature and scope of the *writ of certiorari* to the superior court. It termed the proceeding as a proper one by which the court "may affirm or quash the proceedings as the law which authorizes them may happen to be constitutional or not, and the proceedings themselves regular or irregular, in conformity with or repugnant to its provisions," and took occasion to say,

"There cannot be a doubt that the people of this State have a right to the decision of this court on the constitutionality of any law that may be passed, and of course upon the constitutionality of the very law which gives rise to the proceedings in this case."

By statute, *Section 3735, Rev. Code* 1915, the *writ of*

*certiorari* issues from the superior court as of course. There is no statute limiting or restricting its issuance.

■ An unconstitutional act is as inoperative as if it had never been passed. *Norton v. Shelby County,* 118 *U. S.* 425, 6 *S. Ct.* 1121, 30 *L. Ed.* 178; *Willoughby, U. S. Const., Vol.* 1, § 8.

■ If the act, under which the defendant was convicted and sentenced, was an unconstitutional exercise of the legislative power, the municipal court was without power to act, and its judgment was a nullity. The jurisdiction of the lower court, by the act, is final. The right of appeal is denied. A question of grave public policy and interest is involved, and whatever may be the rule in other jurisdictions, whether founded on statute or practice, we know of no authority in this state which forbids this court, in a *certiorari* proceeding, to determine the constitutionality of a statute under which a conviction was had in an inferior court, with no right of appeal, even if the constitutional question was not there presented.

The motion to strike out the exceptions filed to the record is accordingly denied.

The state contends that the sole question before the court is whether *Sections* 4 and 8 of the *Act,* which are the licensing and penal provisions, are valid enactments; and it seeks to separate these sections from the rest of the act, and to limit the discussion to this narrow question.

If the sole question involved were the power of the Legislature to impose reasonable taxes or license fees upon occupations, there would be no difficulty in reaching a determination, for that power is not questioned. But the question is not so narrow, or so easy of solution. It must be determined whether the sections of the act relating to

licenses, and the punishments provided for failure to secure licenses, are severable from the rest of the act, so that they may stand alone as enforceable provisions.

■ The general rule is that where a statute contains an unconstitutional provision, and another provision which, standing alone, would be valid, the latter will be given effect if the two are so independent of each other that the court can say that the Legislature would have passed the latter even if the former had been omitted; but where the provisions are so connected one with the other, or so dependent one upon the other, that it is apparent that the Legislature would not have passed the act, except as a whole, the entire statute must fall. See *Lewis's Sutherland Stat. Cons., Vol. 1, § 301; 59 C. J. 642; Coleman v. Rhodes, 5 W. W. Harr. (35 Del.) 120, 159 A. 649.*

A reading of the act makes it entirely clear that the purpose of the Legislature was to regulate and control the cleaning, pressing, and dyeing industry. In the preambles the motives and inducements are plainly stated, and by *Subdivision* 2 of *Section* 3, one of the functions and duties of the trade board is stated to be "to establish by such rules and regulations an effective control" of the industry. The license provisions are but incidental. The same Legislature, before the enactment of the act before us, had provided for a license tax on textile renovators, and had defined that occupation. It is not to be supposed that the Legislature intended a double taxation upon this occupation, and we must conclude from the language of the act, which fully discloses the legislative motive and purpose, that the license provisions were intended as a part of a general plan or scheme of regulation and control of the industry, inseparably connected with the body of the act, and not intended to stand alone as independent provisions.

It is necessary, therefore, to consider the act as a whole to discover whether its enactment· was a constitutional exercise of the legislative power, and the precise question to be determined is whether the cleaning, pressing, and dyeing business is so affected with the public interest as to permit the regulation and control allowed by the act.

The police power is the source from which the Legislature derives its authority to regulate and control businesses. A limitation of that power is the due process clause of the *Fourteenth Amendment* to the *Federal Constitution,* which requires that the regulation shall not be unreasonable, arbitrary, or capricious, and that the means of regulation shall have a real and substantial relation to the object to be obtained.

Unquestionably, a Legislature has the power to regulate a trade, business, or occupation, where regulation is necessary for the protection of the public health, safety, or morals, 12 *C. J.* 913; and in this sense it may be conceded that all businesses are subject to some measure of public regulation. Nor will it be denied that the Legislature has power to impose license fees for the permission to carry on particular occupations. 2 *Cooley Const. Lim.* (*8th Ed.*) 1044.

But the question here is, whether the business of cleaning, pressing, and dyeing has become so impressed with the public interest as to justify the regulation and control permitted by this act. Granting the constitutional power in the Legislature to enact the legislation, it must follow that the license to do business issued by the trade board, in accordance with its rules and regulations, constitutes a franchise, and the right to engage in the business exists by public grant, and not as a common right.

Railroads, and other common carriers, and public

utilities are carried on under a public grant of privileges which imposes upon them the duty to render service to all members of the public. With respect to these businesses some public regulation is justified because they are charged with a public use.

The public interest, from the earliest times, has attached to certain exceptional occupations, such as keepers of inns, cabs, and grist mills. These businesses are still regarded as subject to public regulation as being of a public nature.

There are also businesses which, though not public at their inception, by reason of social evolution, have come to hold such a peculiar and close relation to the public as to become subject to some governmental regulation, the reasoning being that the owner, by devoting his business to the public use, in effect, grants the public an interest in that use, and subjects himself to public regulation to the extent of that interest. *New State Ice Co. v. Liebmann*, 285 *U. S.* 262, 52 *S. Ct.* 371, 76 *L. Ed.* 747; *Chas. Wolff Packing Co. v. Court of Industrial Relations*, 262 *U. S.* 522, 43 *S. Ct.* 630, 633, 67 *L. Ed.* 1103, 27 *A. L. R.* 1280.

The question for decision is whether the business of cleaning, dyeing, and pressing is within this class.

In the preamble to the act an emergency is declared, caused, as it is said, by abnormal disruption of economic conditions, particularly productive of disorganization of the cleaning, dyeing, and pressing trade. Wherefore, it is declared that the public welfare demands an effective regulation of the trade for the purpose of promoting and protecting the public welfare, and to eliminate unfair, unsanitary, and demoralizing trade practices.

But, constitutional power is not born of ex-

traordinary conditions. *A. L. A. Schechter Poultry Corporation et al. v. United States,* 295 *U. S.* 495, 55 *S. Ct.* 837, 79 *L. Ed.* 1570, 97 *A. L. R.* 947. Nor is the declaration of a Legislature that a business has become impressed with a public interest, and therefore subject to public regulation, necessarily determinative of the question, for the courts may always inquire into the circumstances of its supposed change from the status of a private business and its freedom from regulation into one in which the public has come to have an interest. *Chas. Wolff Packing Co. v. Court of Industrial Relations, supra; Block v. Hirsh,* 256 *U. S.* 135, 41 *S. Ct.* 458, 65 *L. Ed.* 865, 16 *A. L. R.* 165.

Concededly, it is difficult to lay down a practical rule by which it may be determined when a business has become affected with the public interest. Generally, the right of regulation is dependent upon a reasonable necessity for its exercise to protect the health, morals, or general welfare of the public. More specifically, the circumstances must be such as create a peculiarly close relation between the public and those engaged in it, as where a business has come to be of such public consequence that it substantially affects the community at large. *Chas. Wolff Packing Co. v. Court of Industrial Relations, supra; Munn v. Illinois,* 94 *U. S.* 113, 126, 24 *L. Ed.* 77. The hypothesis of the cases is that the public has an interest in the business by reason of considerations of health or safety, or because of its indispensability, or its monopolistic character and consequent exorbitant charges and arbitrary control. But the object of the legislation must be the public good, not the benefit to individuals or classes. 12 *C. J.* 929; *Chas. Wolff Packing Co. v. Court of Industrial Relations, supra.*

Upon these considerations, statutes designed to protect the public against incompetent persons engaged in the practice of medicine, dentistry, and pharmacy have uniformly

been regarded as a proper exercise of legislative power. With less uniformity of opinion the occupation of plumbing, upon considerations of the public health, has been held to be a business affected with the public interest, and hence subject to public regulation. *People ex rel. Nechamcus v. Warden,* 144 *N. Y.* 529, 39 *N. E.* 686, 687, 27 *L. R. A.* 718, one of the cases upholding an act regulatory of the plumbing business, concedes that it "skirts pretty closely that border line" beyond which the Legislature may not go. On the other hand, *Replogle v. Little Rock,* 166 *Ark.* 617, 267 *S. W.* 353, 36 *A. L. R.* 1333, and *State ex rel. Richey v. Smith,* 42 *Wash.* 237, 84 *P.* 851, 5 *L. R. A.* (*N. S.*) 674, 114 *Am. St. Rep.* 114, 7 *Ann. Cas.* 577, deny the power of the Legislature to regulate and control such occupation. Likewise the occupation of a barber has been held subject to a public regulation, *State v. Tag,* 100 *Md.* 588, 60 *A.* 465, a decision said, in *Dasch v. Jackson* (*Md.*), 183 *A.* 534, 540, to be "the farthest point reached by the tide of regulation of labor and industry."

Manifestly there are many trades, occupations, and businesses which, in the progress of civilization, have become so intimately and indispensably connected with everyday life as to become clothed with a public interest for the reason that they have come to have a reasonable relation to the public safety, health, or general welfare. But there must be a limit to legislative power to regulate and control ordinary occupations and common callings if the constitutional safeguards are to be something more than empty phrases. The right to labor and to enjoy the rewards thereof are natural rights not to be interfered with unreasonably. Common occupations or employments, harmless and lawful in themselves, not calling for the exercise of any special skill and having no substantial relation to the public health or safety, may be followed without regulation

or interference as a matter of common right, for such right constitutes property. *Allgeyer v. Louisiana,* 165 *U. S.* 578, 17 *S. Ct.* 427, 41 *L. Ed.* 832; 1 *Cooley Const. Lim. (8th Ed.)* 747, *note.*

As said by Chief Justice Taft in the case of *Chas. Wolff Packing Co. v. Court of Industrial Relations, supra:*

"It has never been supposed, since the adoption of the Constitution, that the business of the butcher, or the baker, the tailor, the wood chopper, the mining operator, or the miner was clothed with such a public interest that the price of his product or his wages could be fixed by state regulation," and, said he,

"Nowadays one does not devote one's property or business to the public use or clothe it with a public interest merely because one makes commodities for, and sells to, the public in the common callings of which those above mentioned are instances."

So, in *New State Ice Co. v. Liebmann,* 285 *U. S.* 262, 52 *S. Ct.* 371, 374, 76 *L. Ed.* 747, a statute of Oklahoma forbidding the State Corporation Commission to license the manufacture, sale, or distribution of ice, except on proof of necessity, and authorizing the denial of a license where sufficient licensed facilities existed, was held void as an unreasonable interference with private business. The court said:

"Here we are dealing with an ordinary business, not with a paramount industry, upon which the prosperity of the entire state in large measure depends. It is a business as essentially private in its nature as the business of the grocer, the dairyman, the butcher, the baker, the shoemaker, or the tailor, each of whom performs a service which, to a greater or less extent, the community is dependent upon and is interested in having maintained; but which bears no such relation to the public as to warrant its inclusion in the category of business charged with a public use."

In the recent case of *Dasch et al. v. Jackson, supra,* an act for the licensing and regulation of paper hangers was held violative of the due process and equal protection clauses of the *Fourteenth Amendment* to the *Federal Constitution,* the occupation, as it was said, not differing from

other similar occupations, such as house painting, carpentry, stone cutting, bricklaying, horse-shoeing, repairing machinery, wood carving, plastering, and the like, which men have from time immemorial followed without regulation or interference as a matter of common right, and which have no substantial relation to the public health or safety.

In the recent case of *Kent Stores of New Jersey et al. v. Wilentz, Attorney General,* 14 *F. Supp.* 1, decided on March 11, 1936, by the U. S. District Court of New Jersey, it appears that a New Jersey statute regulating the cleaning and dyeing trade was held to be unconstitutional, and that the price fixing provisions of the act could not be sustained on the theory that the business was affected with a public interest.

 Nothing is more clearly settled, under the *Fourteenth Amendment,* than that it is beyond the power of a state, under the guise of protecting the public, arbitrarily to interfere with private business or prohibit lawful occupations, or impose unreasonable and unnecessary restrictions upon them. *Burns Baking Co. v. Bryan,* 264 *U. S.* 504, 44 *S. Ct.* 412, 68 *L. Ed.* 813, 32 *A. L. R.* 661; *Liggett Co. v. Baldridge,* 278 *U. S.* 105, 49 *S. Ct.* 57, 73 *L. Ed.* 204.

In the act before us the purpose to promote sanitary conditions in the trade is expressed, but merely as a convenient and appealing conception around which to effect price control, which is the real purpose. The purpose is not concealed. It is boldly set forth. The *sixth paragraph* of the *third section* provides that:

"For the purposes of this Act, the performance by any person, firm or corporation, subject to the provisions of this Act, of work or services at less than the reasonable cost thereof, will be *prima facie* evidence of the performance of such work and services in an unsanitary manner."

The trade board, a majority of which must be engaged

in the industry, may refuse to grant a license to an applicant, or may suspend or revoke a license granted. True it is that an appeal lies to the superior court, but the appeal does not operate as a supersedeas and, pending the appeal, the applicant or licensee must refrain from operating, or subject himself to prosecution before a summary court with no right of appeal.

Moreover one of the functions, powers, and duties of the trade board is to adopt rules and regulations whereby to establish an effective control over the industry; and the rules and regulations so adopted are expressly declared to have the force and effect of law, violations of which are made misdemeanors. It has the power to conduct hearings, to subpœna witnesses, and to examine books, documents, and papers, together with the power of visitation at all reasonable hours.

It is not necessary to decide whether the act is void as constituting a delegation of legislative power, or whether the rules adopted are mere administrative regulations within the circumference of powers properly granted, for undeniably, the act confers and contemplates an extraordinary measure of control over the industry.

The rules and regulations, declared to have the force and effect of law, may be judicially noticed, 1 *Jones Ev.*, § 122; 5 *Wigmore Ev.*, § 2572; 23 *C. J.* 99; and, at least, will serve to show the trade board's conception of its power and authority.

Having in mind *paragraph* 6 of *Section* 3, *rule* 1 begins thus:

"For the purpose of *Section* 3, *Sub-division* 6 of the *Act*, the minimum reasonable costs for the performance of cleaning, dyeing and/or pressing work or services shall be

as follows," and then follow in minute detail the minimum prices to be charged for every kind of work. By *rule* 5 the trade board may refuse, suspend, or cancel a license if it has reasonable cause to believe that the applicant or licensee appears to be financially irresponsible, has made a false statement to the trade board, has violated any provision of the act or any rule of the trade board, has been, or is, guilty of prohibited trade practices, or of unfair competition as defined in the regulations, or if any wholesaler has received, or is receiving, work from an unlicensed retailer. So, if a licensee cuts the price by one penny, he may lose his license, or be prosecuted for doing work in an unsanitary manner, or for maintaining an unsanitary establishment, and the burden of proof is cast upon him to exculpate himself. On the other hand, for all that appears either by the act itself or by the regulations, a licensee may, with the blessing of the trade board, make any charge whatever above the established minimum charges.

To the unprejudiced mind the end in view is not, specifically, the public health, or generally, the public welfare, but it is to maintain prices and to control the industry.

There seems to be nothing peculiar in the business which distinguishes it from ordinary work and labor. Such work is frequently done, and well done, by the housewife. Considerations of the public health are so remote as to be negligible. Vast authority is centered in a governing board, a majority of which are directly interested in the industry, but who, nevertheless, are empowered to act in a judicial capacity, and to sit in judgment over fellow members of the trade. Too great a strain is imposed upon human frailty. The practical tendency of the legislation is to create and foster monopoly, to prevent, not to encourage competition, to maintain maximum, not minimum prices, all of which is against, not in aid of, the interest of the consuming

public. The act savors of an attempt to establish the ancient guild which, operating not so much for the public benefit as for the advantage of its members, had come 200 years ago to be regarded as an unmitigated evil.

Freshly pressed and cleaned apparel is not to be despised. Change of color to suit the taste or convenience is readily recognized as desirable. Establishments where such work is carried on are conveniences, but the business is not of such paramount importance, or of such imperative necessity, to society as to be affected with a public interest justifying the regulation and control permitted by this act.

The act is violative of the *Fourteenth Amendment* of the *Federal Constitution,* and the *seventh section* of *Article* 1 of the *Delaware Constitution.* It is, consequently, void, and the conviction of the defendant in the municipal court must be set aside.

The judgment below is reversed.