[Civ. No. 28244. First Dist., Div. One. Sept. 16, 1971.]

BAYSIDE TIMBER COMPANY, INC., Plaintiff and Respondent, v. BOARD OF SUPERVISORS OF SAN MATEO COUNTY et al., Defendants and Appellants.

**COUNSEL**

Keith C. Sorensen, District Attorney, James M. Parmelee, Chief Deputy District Attorney, and Henry A. Dietz, Deputy District Attorney, for Defendants and Appellants.

Douglas J. Maloney, County Counsel (Marin), Joseph A. Forest, Deputy County Counsel, William M. Siegel, County Counsel (Santa Clara), R. Frederic Fisher, Thomas S. Brigham and Lillick, McHose, Wheat, Adams & Charles as Amici Curiae on behalf of Defendants and Appellants.

Huber & Goodwin, Murray, Cissna & Prior, Hession, Creedon, Hamlin, Kelly, Hanson & Farbstein and Dennis Hession for Plaintiff and Respondent.

Thomas C. Lynch and Evelle J. Younger, Attorneys General, S. N. Gruskin, Assistant Attorney General, R. H. Connett, Deputy Attorney General, Vaughan, Paul & Lyons, Darling, Hall, Rae & Gute, Walter S. Rountree and Varnum Paul as Amici Curiae.

**OPINION**

**ELKINGTON, J.**—This appeal is prosecuted by the San Mateo County Board of Supervisors and Planning Commission from a judgment against them in favor of Bayside Timber Company, Inc., directing the issuance of a peremptory writ of mandate.

By ordinance, San Mateo County purports to regulate logging operations within the county by "use permit."[1] The county also by ordinance, "to protect the natural beauty of the County and protect property owners

---

[1]Chapter 24, part 1, division VI, San Mateo County Ordinance Code (Zoning Annex), sections 6200, 6201(6).

from unnecessary loss from erosion and flooding from grading operations," regulates excavation and grading for road purposes.[2]

Respondent Bayside Timber Company, Inc., was the owner of redwood timber land in San Mateo County. It had, under the State Forest Practice Act (Pub. Resources Code, §§ 4521-4618; sometimes herein called the Act), obtained a timber operations permit to log the land. The State Division of Highways had given the company an "encroachment permit" which authorized connection of logging roads with a state highway. Application was then made to the county by the company for a logging use permit and a grading permit for the logging roads which would become necessary to its operations. The applications were opposed by many residents, and organizations of residents, of San Mateo County. After generally favorable rulings by the county planning commission, on appeal to the board of supervisors each of the applications was denied. The latter decisions resulted in the company's mandamus petition to the superior court to compel issuance of the requested use and grading permits.

After a trial the superior court concluded that the state had preempted the field of regulation of timber operations by the enactment of the Forest Practice Act, that San Mateo County had "no power or authority to require, grant, or deny permits for timber operations," and that accordingly "issuance of a timber operations permit to plaintiff would be superfluous." The county's timber operations use permit ordinance was adjudged "invalid and unenforceable to the extent that [it purports] to require the issuance of a permit . . . prior to engaging in timber operations." A peremptory writ of mandate requiring the county to issue the requested road grading permit was ordered by the judgment.

It is this "Judgment Granting Peremptory Writ of Mandate" from which the San Mateo County officials have appealed.

The first issue presented by the appellants' briefs is the question of the constitutionality of the Forest Practice Act. The issue is raised for the first time on this appeal, counsel frankly confessing that "no one thought of the constitutional issue until preparation of appellants' opening brief."

Respondent, relying on *Jenner* v. *City Council,* 164 Cal.App.2d 490, 498 [331 P.2d 176], argues that such a constitutional issue may not now be considered since " 'It is the general rule applicable in civil cases that a constitutional question must be raised at the earliest opportunity or it will be considered as waived.' . . ."

*Jenner* v. *City Council,* however, merely reiterates the general rule

---

[2]Chapter 8, division VII, San Mateo County Ordinance Code, sections 8600-8606.

that appellate courts will not *ordinarily* consider matters raised for the first time on appeal. (See 3 Witkin, Cal. Procedure (1954) pp. 2261-2262, Appeal, § 94.) There are many situations where appellate courts will consider such matters. They will often be considered where the, issue relates to questions of law only. (*Tyre* v. *Aetna Life Ins. Co.*, 54 Cal.2d 399, 405 [6 Cal.Rptr. 13, 353 P.2d 725]; *Jones* v. *Fireman's Fund Ins. Co.*, 270 Cal.App.2d 779, 783-784 [76 Cal.Rptr. 97].) Appellate courts are more inclined to consider such tardily raised legal issues where the public interest or public policy is involved. (*People* v. *Rodriguez*, 58 Cal.App.2d 415, 421 [136 P.2d 626].) And whether the rule shall be applied is largely a question of the appellate court's discretion. (*Isthmian Lines, Inc.* v. *Schirmer Stevedoring Co.*, 255 Cal.App.2d 607, 610 [63 Cal.Rptr. 458].)

The above quoted language of *Jenner* is taken verbatim from *Hershey* v. *Reclamation District No. 108*, 200 Cal. 550, 564 [254 P. 542], in which the court after stating the general rule, nevertheless *did* (apparently because the point was of public importance) proceed to pass upon the constitutionality of the subject statute. In *Higbie* v. *County of Los Angeles*, 47 Cal.App.2d 281, 289 [117 P.2d 933], where the appellate court was presented with a previously unraised constitutional question, it was said: "A sufficient answer to this argument should be that 'one who receives the benefit from an unconstitutional law is estopped from asserting its unconstitutionality.' (*Hershey* v. *Reclamation Dist. No. 108*, 200 Cal. 550 [254 Pac. 542], at 564.) As the questions are of considerable importance, we will not rest on this well-established rule, but will consider the several arguments of plaintiff on this phase of the case."

With considerable logic it has even been held that: "A fundamental public right, . . . which involves the interest of the citizens at large cannot be disregarded, and a constitutional question in respect thereof may be raised at any time, and even upon the court's own motion" (*Craig* v. *Board of Education of City of New York*, 173 Misc. 969 [19 N.Y.S.2d 293, 302]); and that it is contrary to the public interest to permit public officials to waive public constitutional rights by failure to raise them at the trial level. (*State* v. *Becker*, 194 Wis. 464 [215 N.W. 902, 904].)[3]

■ Yet another consideration facing us at this point, however, is the long-established rule that an appellate court will not enter upon the resolu-

---

[3]See generally on the question of waiver of constitutional rights on appeal by failure to raise the issue at trial: *Ex Parte Bass*, 328 Mo. 195 [40 S.W.2d 457, 459]; *State* v. *Duncan*, 333 Mo. 673 [63 S.W.2d 135, 138]; *State* v. *Smith*, 336 Mo. 810 [81 S.W.2d 613, 614]; *Mountain States T. & T. Co.* v. *Animas Mosquito Con. Dist.*, 152 Colo. 73 [380 P.2d 560]; *Townsend* v. *Beck*, 140 Fla. 553 [192 So. 390, 392]; *Markey* v. *Connelly* (Wyo.) 367 P.2d 964, 966; *State* v. *Spears*, 358 Mo. 23 [213 S.W.2d 210, 212]; *Remine* v. *Knox County*, 182 Tenn. 680 [189 S.W.2d 811].

tion of constitutional questions unless absolutely necessary to a disposition of the appeal. (*Marin Municipal Water Dist.* v. *Dolge,* 172 Cal. 724, 726 [158 P. 187]; *Estate of Johnson,* 139 Cal. 532, 534 [73 P. 424]; *Estate of Crane,* 73 Cal.App.2d 93, 102 [165 P.2d 940].) In this respect we have concluded, as found by the trial court and here argued by respondent, that the Forest Practice Act does purport to preempt the field of logging and timber operations in California. ■ To fully dispose of the appeal it would be necessary to pass upon the constitutional question raised by appellants.

Obviously the tendered constitutional issue concerns only a question of law. And we perceive no attendant prejudice to respondents were the matter to be considered by us at this time.

The remaining question is whether there is indeed a public interest in the Forest Practice Act, i.e., in the regulation of private logging and timber practices, and if so, whether our discretion should be exercised as requested by appellants.

We observe initially that the Forest Practice Act itself (§ 4541) declares "the existence of a public interest in the forest resources and timberlands of this state."

On the same subject we are invited to consider an abundance of published literature relating to private logging and timber operations in California and to the Forest Practice Act.

It seems to be widely recognized that few, if any, industries adversely affect the rights of others, and the public generally, as do timber and logging operations.[4]

In much of California's forest areas soils are sedimentary, and ordinarily quite unstable. The erosion of such land is believed to be increased by a factor of 25 to 1 when the native vegetation is removed. The problem seems to be compounded by the practice of constructing and using logging and skid roads, and the operation of trucks and tractors up and down stream beds.[5]

Normally such operations are said to send enormous quantities of silt and debris onto the land of lower riparian owners.[6] Describing a recent flood-

---

[4]See 54 California Law Review 1117, Comment: *Trees, Earth, Water and Ecological Upheaval: Logging Practices and Watershed Protection in California.*

[5]Hearings Before the California State Board of Forestry at S-2 and S-3 (Feb. 26, 1965.)
Haupt & Kidd, *Good Logging Practices Reduce Sedimentation* (1965) 63 J. Forestry 664.
54 California Law Review 1117 et seq.

[6]Hearings Before the California State Board of Forestry (Feb. 26, 1965); Remarks of S. Pyle, Chief of Planning, North Branch, Dept. of Water Resources.

ing it was said, "These lowlands were battered by tons of slash, cut logs, and whole trees washed down the rivers; worst of all was the three to six foot layer of silt left behind by the receding waters—soil washed off the slopes of watersheds exposed to the torrents."[7] It is known that uprooted trees and unwanted logs by the thousands, left behind by loggers, have in time of flood backed up behind and then buckled and destroyed highway bridges.

Destructive erosion and siltation is blamed by some entirely on reckless logging;[8] others believe it to be but a major contributing cause. But there seems to be common agreement that the denuding of forest land intensifies flooding, and its effect upon the property of others.[9]

It is said that the greatest "threat to salmon and steelhead are land use practices which are destroying the basic productivity of streams by promoting the flow of silt and debris from adjacent lands."[10] And at least one California river "has been dammed four times since 1920; yet as soon as reservoirs have been built, they have been filled with more mud than water."[11] It was said, "If we continue careless practices of land use on our major watersheds, our entire reservoir system will someday be converted into a series of flat alluvial plains through which old rivers will cut their channels as they flow to the sea."[12]

Much criticism has been levelled at private logging and timber practices in California under the Forest Practice Act.[13] Some illustrations: The use of "skyline cranes" instead of the more economical use of tractors in moving logs is said to reduce the necessary logging roads per 1,000 acres from 10 miles to 1 mile. The skyline operation would also reduce the exposed erosible area by from 60 to 75 percent. Nevertheless, the latter method appears to be seldom, if at all, used in California.[14] So-called "buffer strips" of untouched vegetation between eight and thirty feet wide have proven highly effective in preventing silt and slash from reaching streams, but they appear to be rarely used in our state.[15] There is frequent

[7]54 California Law Review 1117, 1118.

[8]Douglas, A Wilderness Bill of Rights (1965) p. 129.

[9]54 California Law Review 1117, 1118-1119.

[10]Hearings before the Assembly Interim Commission on Fish and Game (Oct. 10, 1961); Statement on Behalf of W. T. Shannon, Director of Department of Fish and Game.

[11]Dasmann, The Destruction of Game in California (1965) pp. 167, 168.

[12]Dasmann, op.cit., at pp. 167-168.

[13]54 California Law Review 1117, 1121.

[14]Woodridge, Watershed Disturbance From Tractor, Skyline Logging (1960) 58 J. Forestry 369.

[15]Haupt & Kidd, Good Logging Practices Reduce Sedimentation (1965) 63 J. Forestry 664.

complaint of " 'gyppo' loggers who move quickly from job to job, leaving havoc in their wake, and starting a vicious cycle of erosion whose full implications may not appear for years to come."[16] This "fly by night logger still plays an important role in the industry."[17] And it has been said that a "close examination of the Act and of the local forest practice rules indicates that the self-regulation theory remains essentially fallacious."[18]

We do not arrive at any specific conclusions on the weight or credibility to be given the foregoing several comments—they may well present an unfair and biased picture. But from *any* objective view, we believe all must agree that regardless of how they are actually conducted, private logging and timber operations of this state are a matter of fundamental public concern.

We have accordingly chosen to pass upon the constitutional issue presented.

■ We are concerned with the Public Resources Code and the Forest Practice Act (§§ 4521-4618 of that code) as in effect prior to its 1970 amendments. Although for convenience the present tense will be used, statutory references, unless otherwise specified, will be to the Public Resources Code prior to its amendments of 1970.

Sections 630-631 create a State Board of Forestry consisting of seven members. One member shall "be appointed from the general public." In addition, "each of the following fields shall be represented by a member . . .: (1) The pine producing industry. (2) The redwood producing industry. (3) Forest land ownership. (4) The range livestock industry. (5) Agriculture. (6) The beneficial use of water."

The State Board of Forestry is charged with "the protection of the state's interests in forest resources on private lands, and [to] determine, establish, and maintain an adequate forest policy." (§ 639.)

Section 4541, as previously pointed out, declares "the existence of a public interest in the forest resources and timberlands of this state." It

---

[16]Senate Interim Commission on Beach and Stream Erosion, Final Report to Legislature (1957).
California State Board of Forestry, Enforcement of the Forest Practice Act— Special Report (1957).

[17]Dasmann, The Destruction of California (1965).

[18]54 California Law Review 1117, 1127, the author of which states: "A conclusion also reached by Emanuel Fritz, the author of the original 1945 Forest Practice Act. 'Self-regulation has failed for various reasons after twenty years of educational effort.' Senate Interim Committee on Beach and Stream Erosion, Final Report to Legislature 14 (1957)."

also expresses the purpose of the Forest Practice Act, among other things, to "(d) Authorize the creation of district forest practice committees which shall formulate and adopt forest practice rules, and approve forest management and alternate plans for final approval of the board."

Section 4551 provides that the "privately owned commercial forest areas of the state are divided into four regional groups known as forest districts. . . ." One of these is known as the Redwood Forest District which generally comprises the northern California coastal counties including San Mateo County. (§ 4552.)

Section 4562 provides that a forest practice committee "consisting of five members shall be established for each district." Of these five members "two shall be private timber owner-operators . . ., one shall be a private timber owner [and nonoperator] owning 1,000 acres or more of commercial timber . . . and one shall be a farmer-timber owner owning not less than 160 acres nor more than 1,000 acres of commercial timber. . . ." (§ 4563.) The fifth member of the committee "shall be a member of the [State Board of Forestry or an employee designated by the board]" who "shall meet with and take part in all deliberations of the committee, but shall not have the power of a vote except in the case of a tie." (§ 4564.)

Each forest practice committee "shall formulate forest practice rules for the district to fulfill the purposes of the [Forest Practice Act]." (§ 4571.)

Section 4572 then provides that after formulation of its rules "the committee shall submit the rules to the private timber owners within the district for approval. . . ." If two-thirds of the "private timber ownership voting in the district" approve them, the rules shall then be submitted to the State Board of Forestry.

Sections 4574 and 4575 state that timber owners and timber operators of the district may themselves submit to the forest practice committee plans or alternate plans in lieu of the committee's formulated rules, which may be received and approved by the committee.

Section 4576 provides that if in the opinion of the State Board of Forestry the rules or plans of sections 4572, 4574 and 4575 are "within the purposes and intent" of the Act, they shall be approved by the board. If any rules or plans are disapproved by the board, they shall be returned to the committee with recommendations for amendments thereto. Thereafter "Resubmission of rules or plans in amended form may be made after repetition of the entire original procedure."

The Act (§ 4577) provides: "Forest practice rules, forest management

plans, and alternate plans, approved by the [State Board of Forestry], have the force of law within the district in which the rules originated. . . ."

It seems proper at this point to summarize such portions of the Forest Practice Act as are directly relevant to the question before us.

The content of the rules under which private logging operations are conducted is decreed exclusively by persons pecuniarily interested in the timber industry, i.e., timber owners and operators. The ultimate basis of this exclusive control rests in the hands of the "private timber ownership," two-thirds of which must agree before *any* proposed rule may be adopted. Ordinarily such rules are formulated by the four timber owners or operators of the forest practice committee, but they may nevertheless be drafted by the district's private timber ownership. The rules are submitted to the State Board of Forestry which may approve or disapprove them. It is noteworthy that the board is powerless itself to promulgate any forest practice rule. It may only approve or disapprove those which are submitted.

It follows that without agreement of the "private timber ownership," no power in California has authority to impose rules to insure reasonable environmental and public protection from logging abuses.

Another noteworthy feature of the Forest Practice Act requires comment.

As pointed out, the Legislature has delegated to timber owners and operators the exclusive power to formulate forest practice rules which, when adopted, have the force and effect of law.

Yet in this delegation of legislative authority no guides or standards to prevent its abuse are laid down by the Act. The combination of forest practice committees and timber ownership, in their absolute discretion, are free to formulate, or not formulate, rules tending to prevent erosion, to lessen flooding, to protect wildlife, to preserve natural beauty, or otherwise to serve the public interest.[19] As such rules are formulated, whether they be

---

[19]Some of the necessary forest practices and controls for which no standards are set, relate to: "soil erosion control, water quality and watershed control, flood control, . . . mass soil movements, submission of logging plans, location and grade of logging roads and skid trails, excavation and fill requirements, . . . slash and debris disposal, haul routes and schedules, hours and dates of logging, and performance bond requirements." (See § 4582, added 1970.)

The Forest Practice Act does purport to set limited standards (of questionable sufficiency) to insure continued availability of timber, as follows:

Section 4541:

"The purpose of this chapter is to do all of the following: . . .

"(b) Declare the necessity of good forest practices in the harvesting of forest re-

in the public interest or timber industry interest, or otherwise reasonable or effective, is likewise left to the uncontrolled discretion of the committee and the timber ownership.

It is contended by appellants that such an industry-oriented statutory scheme is an unreasonable exercise of the state's police power, that it abuses the due process rights of San Mateo County and its citizens, and that it amounts to an unconstitutional delegation of legislative power. The constitutional issues which we shall consider are accordingly framed.

It has repeatedly been held that (1) "truly fundamental issues" should be resolved by the Legislature, and (2) that any grant of legislative authority must be accompanied by "safeguards adequate to prevent its abuse." Lacking the required safeguards such a grant of authority is an unconstitutional delegation of legislative power. (*Wilke & Holzheiser, Inc.* v. *Dept. of Alcoholic Bev. Control,* 65 Cal.2d 349, 369 [55 Cal.Rptr. 23, 420 P.2d 735]; *Kugler* v. *Yocum,* 69 Cal.2d 371, 376 [71 Cal.Rptr. 687, 445 P.2d 303], and see authorities there cited.) And the Legislature cannot constitutionally avoid its responsibility as to such fundamental issues "by explicitly delegating that function to others or by failing to establish an effective mechanism to assure the proper implementation of its policy decisions." (*Kugler* v. *Yocum, supra,* pp. 376-377.)

It is most certainly a "truly fundamental issue" whether the state's environment and ecology, and the public generally, are to be protected by law from harmful practices of the logging and timber industry. It follows, since the Legislature has chosen to delegate such law-making power, that its failure to prescribe any standards or "safeguards to prevent its abuse" impresses upon the Act constitutional taint.

---

sources to conserve and maintain the productivity of the timberlands in the interests of the economic welfare of the state and the continuance of the forest industry.

"(c) Establish forest districts in which standards of forest practice shall be adopted to promote the maximum sustained productivity of the forests. . . ."

Section 4542:

"The public interest is affected by the management of forests, timberlands, watersheds and soil resources of the state, and it is the policy of this state to encourage, promote and require such development, use, and management of forests and timberlands as will maintain the continuous production of forest products, to the end that adequate supplies of forest products are assured for the needs of the people and industries. It is the policy of this state to encourage and assist private ownership in the management and economic development of privately owned timberlands."

Section 4571: "Each committee shall formulate forest practice rules for the district to fulfill the purposes of this chapter. The rules shall apply to old growth and young growth timber and shall include measures for fire prevention and control, for protection against timber operations which unnecessarily destroy young timber growth or timber productivity of the soil, for prevention and control of damage by forest insects, pests and disease, and measures for the restocking of the land."

When legislative authority without standards for its guidance is delegated to an agency or group of individuals with a pecuniary interest in its subject matter, the constitutional fault is compounded.

In the case of *State Board* v. *Thrift-D-Lux Cleaners* (1953) 40 Cal.2d 436 [254 P.2d 29], a Dry Cleaners' Act of 1945 created a seven-member State Board of Dry Cleaners. The board's principle duty was the establishment and regulation of minimum price schedules for the industry. The act provided that the board's membership consist of "one from the general public; two owners of retail plants; two owners of wholesale plants; and two owners of shops." The court considered an argument (such as is made here) that the makeup of the board was unreasonable and a constitutionally invalid exercise of the state's police power.

It was said (p. 448): "Here the statute assumes to confer legislative authority upon those who are directly interested in the operation of the regulatory rule and its penal provisions with no guide for the exercise of the delegated authority. *The board is made up of six active members of the industry,* and one member of the public at large. . . ." (Italics added.) The court likened the situation to that of *Carter* v. *Carter Coal Co.* (1935) 298 U.S. 238, 311 [80 L.Ed. 1160, 1189, 56 S.Ct. 855], where it was said: " '. . . one person may not be entrusted with the power to regulate the business of another, and especially of a competitor. And a statute which attempts to confer such power undertakes an intolerable and unconstitutional interference with personal liberty and private property. The delegation is so clearly arbitrary, and so clearly a denial of rights safeguarded by the due process clause of the Fifth Amendment, that it is unnecessary to do more than refer to decisions of this court which foreclose the question. . . .' " The court (pp. 448-449) considered significant certain language of *Becker* v. *State,* 37 Del. 454 [185 A. 92] (where a similar public agency was found to be unconstitutionally composed), to the effect that " 'vast authority is centered in a governing board, a majority of which are directly interested in the industry, but who, nevertheless are empowered to act in a judicial capacity, and to sit in judgment over fellow members of the trade. Too great a strain is imposed upon human fraility. . . .' "

Stating (p. 449), "Where the Legislature attempts to delegate its powers to an administrative board made up of interested members of the industry, the majority of which can initiate regulatory action by the board in that industry, that delegation may well be brought into question," the California Supreme Court found the Dry Cleaner's Act of 1945 to be constitutionally invalid.

The rationale of *State Board* v. *Thrift-D-Lux Cleaners, supra,* was re-

cently approved and followed in *Blumenthal* v. *Board of Medical Examiners* (1962) 57 Cal.2d 228, 235-236 [18 Cal.Rptr. 501, 368 P.2d 101].

A leading outside authority on the instant issue is found in *Johnson* v. *Michigan Milk Marketing Board* (1940) 295 Mich. 644 [295 N.W. 346]. In that case a constitutional attack was made on a legislatively created milk-marketing board. The court said (p. 351): "The chief difficulty with the present act is in the composition of the Board. Section 5 reads: 'There is hereby created a milk marketing board to consist of 5 members as follows: The commissioner of agriculture shall be a member and chairman of the board by virtue of his office and 4 other members to be appointed by the governor, by and with the advice and consent of the senate, as follows: 2 shall be milk producers not connected with the distribution of milk except by a bona fide producer cooperative marketing association, both of whom shall have as their principal occupation and earn their principal livelihood by the actual management of 1 or more dairy herds; 1 shall be a distributor, and 1 shall be a consumer not connected with the production or distribution of milk. . . .'"

The *Johnson* v. *Michigan Milk Marketing Board* court was careful to point out that "No claim is made that any member of the present Board has acted unfairly or arbitrarily, but the facts remains that the act requires the appointment of a board, a majority of whose members have a direct pecuniary interest in the matters submitted to them. . . ." It then continued, "In order that the administration of the milk industry may be conducted in a fair and impartial manner, it is essential that the Board be impartial in its composition. The act is fatally defective in its provision for the appointment of the personnel of the Board. . . ." The court drew support from *Carter* v. *Carter Coal Co., supra,* 298 U.S. 238, 311, from which it (on p. 352) quoted the following: " 'This is legislative delegation in its most obnoxious form; for it is not even delegation to an official or an official body, presumptively disinterested, but to private persons whose interests may be and often are adverse to the interests of others in the same business. . . .' " The Michigan court then held (p. 353): "No one should act as a judge in his own cause. The Board, as constituted under the statute, is of such a nature that Johnson was not, and could not have been, accorded that impartial hearing which satisfies the requirements of due process. . . ." and that the statutory makeup of the *Milk Marketing Board* violated "both the spirit and letter of the Constitution."

We have been presented with no authority which in any way impugns the holdings of the cases we have cited, and we have been able to find none.

It is of course noted that the cited authority relates to presumed threats

to individual *private* rights resulting from the creation of unfairly constituted public boards. In the case at bench the complaint is that *public* injury must inevitably result from placing exclusive control of the logging industry in the hands of persons who may be expected to profit most from the gathering of logs at the lowest cost and without environmental safeguards. But the rationale of the cited cases is equally, if not more strongly, applicable here, for we believe no one would contend that the law has lesser concern for the overall public welfare than for individual private rights.

It is an age-old principle of our law that no man should judge or otherwise officially preside over disputed matters in which he has a pecuniary interest. The rule is given expression in the law of trusts. "It is against public policy to permit any person occupying fiduciary relations to be placed in such a position that he may be tempted to betray his duty as a trustee." (*Sims* v. *Petaluma Gas Light Co.,* 131 Cal. 656, 659 [63 P. 1011].) California's Constitution, article IV, section 5, notices the same concept by providing that the Legislature shall enact laws to prohibit its members "from engaging in activities or having interests which conflict with the proper discharge of their duties and responsibilities, . . ." The same rule should reasonably apply to those persons empowered by law to promulgate the Forest Practice Act's rules which so vitally affect the public interest.

We are impelled to, and do, conclude that the Forest Practice Act, as in effect prior to its 1970 amendments, insofar as it provides for the promulgation of forest practice rules, is violative of the state and federal Constitutions; it unlawfully and without proper, or any, standards delegates legislative power, and otherwise denies due process of law to the interested and affected public. The judgment must be reversed and the cause remanded to the superior court for further and proper proceedings.

We are required to "pass upon and determine all the questions of law involved in the case, presented upon [this] appeal, and necessary to the final determination of the case. . . ." (Code Civ. Proc. § 53.) Plaintiff will undoubtedly continue in its efforts to log its land; in such a case its application must again come before the county planning commission and, on review, perhaps before the board of supervisors and the superior court. A question which will undoubtedly require resolution in the future is the constitutionality of the Forest Practice Act as presently in effect, and including its 1970 amendments.

As pertinent here the Act's 1970 amendments increase the size of forest practice committees from five to seven members (§ 4562); and require that the two additional members "shall be members of the public having an interest in and knowledge of the environment." (§ 4563.) No change is made in the requirement of section 4572 that forest practice rules must be ap-

proved "by two-thirds of the private timber ownership" of the district. And standards for the guidance of the forest practice committees and the private timber ownership are still not to be found. No substantial constitutional improvement is seen; our announced holding applies to the Act in its present form.

Section 4582 was added to the Act in 1970. It reads as follows: "Notwithstanding any of the provisions of this chapter, the Counties of San Mateo, Marin, and Santa Clara shall have the right, within the reasonable exercise of their police power, to adopt rules and regulations by ordinance or resolution which are stricter than those provided under this chapter and those promulgated by the committee. Such county rules and regulations may include, but are not limited to, matters relating to soil erosion control, water quality and watershed control, flood control, sustained yield timber production, stand density control, reforestation methods, mass soil movements, submission of logging plans, location and grade of logging roads and skid trails, excavation and fill requirements, fire prevention and control methods, slash and debris disposal, haul routes and schedules, hours and dates of logging, and performance bond requirements."

The Act purports to continue in effect, still without standards and with its forest practice rules effectively promulgated only by interested members of the timber industry, even in the counties of San Mateo, Marin, and Santa Clara. The constitutional offense is against the public generally of California. The fact that the named counties may, or may not, choose to adopt "stricter" rules in no way confers constitutional status on such portions of the Act as we have held to be invalid.

Our holding of unconstitutionality concerns only those portions of the Act relating to "Forest Practice Rules" (art. 5, §§ 4571-4582) and to such portions of article 10, "Injunctions and Corrective Action" (§§ 4611-4618), as are necessarily related to the enforcement of such rules.

The resolution of other points raised by the parties has become unnecessary to our disposition of the appeal.

The judgment is reversed. The superior court will take further proceedings not inconsistent herewith.

Molinari, P. J., and Sims, J., concurred.

A petition for a rehearing was denied October 15, 1971, and the opinion was modified to read as printed above. Respondent's petition for a hearing by the Supreme Court was denied November 18, 1971.