[No. D014258. Fourth Dist., Div. One. Apr. 16, 1992.]

In re TANIA S. et al., Persons Coming Under the Juvenile Court Law.
SAN DIEGO COUNTY DEPARTMENT OF SOCIAL SERVICES,
Plaintiff and Respondent, v.
ZIAD S., Defendant and Appellant.

**COUNSEL**

Richard Peters, under appointment by the Court of Appeal, for Defendant and Appellant.

Lloyd M. Harmon, Jr., County Counsel, Susan Strom, Chief Deputy County Counsel, and Patrice Plattner-Grainger, Deputy County Counsel, for Plaintiff and Respondent.

Plourd & Breeze and John W. Breeze, under appointment by the Court of Appeal, for Minors.

## OPINION

**KREMER, P. J.**—Ziad S. appeals the jurisdictional findings and dispositional order in child dependency proceedings brought under Welfare and Institutions Code[1] section 300, subdivisions (a), (b) and (j). Ziad contends (1) the findings and order were not supported by the evidence, and (2) section 300, subdivision (b) is unconstitutional. We affirm.

I

### FACTUAL BACKGROUND

Ziad was born in Iraq and moved to the United States as a young man. Phyllis S. was born and raised in Utah.

In 1972 Ziad and Phyllis married. Ziad and Phyllis and their first four children lived together until 1981.

In 1981 Phyllis and the children separated from Ziad because of domestic violence between the parents.

In August 1989 Phyllis and the children reunited with Ziad in San Diego. Soon after Ziad and Phyllis reunited domestic violence resumed when the children saw Ziad destroy furniture and Phyllis throw a cup at him. Phyllis promised the children she would leave Ziad again if there was further violence.

On September 22, 1990, Ziad asked his oldest child Tania, age 16, to bring him a hot water bottle for his toothache. When Tania did not respond, Ziad confronted her in the kitchen and struck her on the buttocks with the wooden paddle Ziad and Phyllis used to discipline their children. When Phyllis— then pregnant with their fifth child—intervened, Ziad began striking her buttocks and thighs with the paddle. Tania called 911 and summoned police. When Ziad learned Tania had called police, Ziad told her: "You're dead for this." Phyllis and the children then went outside to wait for police to arrive. While Phyllis and the children waited, Ziad went outside, verbally threatened Tania and then hit her face, head and arms. Ziad called Tania a

---

[1]All statutory references are to the Welfare and Institutions Code unless otherwise specified.

"whore," a "bitch," a "fucking slut," a "traitor," and "garbage" for reporting him. Ziad also struck Phyllis again. When Ziad's 10-year-old son Jamiel intervened by jumping on Ziad's back, Ziad tried to hit him on the face and shoulders. Ziad left before police arrived.

On September 26, 1990, the children were taken into protective custody.

## II

### JUVENILE COURT PROCEEDINGS

On October 1, 1990, the San Diego County Department of Social Services (Department) filed dependency petitions alleging Tania, Jamiel and their sisters Josette, age 14, and Chantelle, age 13, came within the provisions of section 300, subdivisions (a), (b) and (j).[2] Specifically, the petitions alleged on September 22, 1990, Ziad subjected Tania and Jamiel to serious physical harm and to substantial risk of serious harm in Phyllis's presence; and between October 1989 and September 22, 1990, the children were exposed to violent confrontations in the family home involving physical abuse between their parents, physical assaults on the children and threats to their safety, all endangering the children's physical safety.

On December 11, 1990, the Department filed a dependency petition alleging Phillip—born to Phyllis and Ziad on November 30, 1990—also came within the provisions of section 300, subdivisions (a), (b) and (j).

On January 17, 1991, the court held a contested jurisdictional hearing. In accord with the parties' stipulation, the court received into evidence various

---

[2]Under section 300 the juvenile court has jurisdiction to declare a minor its dependent child where:

"(a)  The minor has suffered, or there is a substantial risk that the minor will suffer, serious physical harm inflicted nonaccidentally upon the minor by the minor's parent . . . . For the purposes of this subdivision, a court may find there is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the minor or the minor's siblings, or a combination of these and other actions by the parent . . . which indicate the child is at risk of serious physical harm. For purposes of this subdivision, 'serious physical harm' does not include reasonable and age-appropriate spanking to the buttocks where there is no evidence of serious physical injury.

"(b)  The minor has suffered, or there is a substantial risk that the minor will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the minor . . . .

" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"(j)  The minor's sibling has been abused or neglected, as defined in subdivision (a) [or] (b) . . . and there is a substantial risk that the minor will be abused or neglected, as defined in those subdivisions. . . ."

documents including the social worker's reports, psychological evaluations and letters the children wrote expressing their views. The court also heard testimony from Ziad and Phyllis. After hearing, the court found all the children were persons described in section 300, subdivisions (a), (b) and (j).

In March 1991 at the dispositional hearing the court declared the four oldest children to be its dependent children. The court ordered removal of those children's custody from both parents under section 361, subdivision (b)(1).[3] The court ordered the children detained with Phyllis on the conditions (1) the children continue therapy sessions, (2) Phyllis notify the social worker if Tania disrupted the home, and (3) Phyllis comply with visitation orders for Ziad. The court stated complete reunification of the family was the goal, such reunification would likely be successful and both parents were making good progress with the court orders to date. Ziad appeals.

## III

### DISCUSSION

### A

### SUFFICIENCY OF THE EVIDENCE

Ziad meritlessly contends the evidence does not support the jurisdictional findings and dispositional order removing the children from his custody. The juvenile court's jurisdictional findings and dispositional order are supported by substantial evidence.

"In reviewing the sufficiency of the evidence, our review requires that all reasonable inferences be given to support the findings and orders of the juvenile court and the record must be viewed in the light most favorable to those orders. [Citation.] Those findings and orders may not be disturbed if they are supported by substantial evidence. [Citations.] As stated: 'Issues of fact and credibility are questions [of fact] for the trial court, not this court. [Citation.] "The rule is clear that the power of the appellate courts begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion

---

[3]Section 361 provides in relevant part:

"(b) No dependent child shall be taken from the physical custody of his or her parents . . . unless the juvenile court finds clear and convincing evidence of any of the following:

"(1) There is a substantial danger to the physical health of the minor or would be if the minor was returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parents' . . . physical custody."

reached by the trier of fact." [Citation.]' [Citation.]" (*In re Samkirtana S.* (1990) 222 Cal.App.3d 1475, 1487 [272 Cal.Rptr. 489], disapproved on another point in *In re Horton* (1991) 54 Cal.3d 82, 92-93 [284 Cal.Rptr. 305, 813 P.2d 1335].) Further, at a dispositional hearing the court "must undertake 'a judicious appraisal of all available evidence bearing on the child's best interests' including an evaluation of the relative merits of alternative custody awards. [Citation.]" (*In re B. G.* (1974) 11 Cal.3d 679, 693 [114 Cal.Rptr. 444, 523 P.2d 244].)

During 1989 and 1990 both Ziad and Phyllis spanked the children with a wooden paddle, sometimes leaving marks and welts. Ziad told clinical psychologist Michel he preferred to "humiliate" his children as opposed to physically punishing them. Such humiliation often involved abusive and offensive language. However, the record shows Ziad's conduct went well beyond spanking and humiliation.

On September 22, 1990, Ziad struck Tania's face, head and arms. When Jamiel tried to intervene, Ziad tried to hit him on the face and shoulders. Ziad hit his pregnant wife Phyllis when she tried to intervene and again as she waited with the children for police to arrive.

On September 25, 1990, Ziad hit Tania 20 times. Tania was afraid to tell the social workers for fear of reprisal.

Later Ziad told the social worker he had not done anything wrong and if given the chance would do it again. Ziad admitted to police he hit Tania 20 times on September 25 and said he did not believe any acts he took against his children were excessive.

The children's statements to social workers offered further evidence of Ziad's excessive conduct. None wanted to return home. Tania feared Ziad and his family. Tania believed it would never be safe for her to go home. Josette was afraid of Ziad and did not want to go home until the fighting stopped and Ziad was gone. Chantelle was afraid of Ziad and did not want to go home until he was gone. Both Josette and Chantelle said Ziad hit them a lot and their home situation was worsening. Jamiel thought the hitting at home was "stupid" and wrong. He wanted it to stop. Jamiel did not want to go home until things improved.

According to clinical psychologist Michel, Ziad blamed the social service system and his children for problems he himself actually created. Clinical psychologist Fox reported Ziad's physical and emotional abuse seriously damaged the children's self-esteem. Fox and marriage, family and child

counseling intern Zanoni both believed Ziad's absence from the home was "in the best interests of the children's well-being." Fox recommended against unsupervised visitation between Ziad and the children until Ziad participated in individual psychotherapy for at least two months.

On this record the juvenile court reasonably found based upon substantial evidence the children were at substantial risk of serious harm and Ziad's continued custody of the children created a substantial risk of physical harm to them.[4] ■■■ Thus, we do not disturb the court's jurisdictional findings or dispositional order.[5]

## B

### CONSTITUTIONALITY OF SECTION 300, SUBDIVISION (b)

Ziad also contends the court's findings under section 300, subdivision (b), should be reversed because the statute assertedly violates the establishment of religion clauses of the United States and California Constitutions. (U.S. Const., 1st Amend.; Cal. Const., art. I, § 4.) ■ Preliminarily, we note Ziad did not challenge the statute's constitutionality in the juvenile court. Ordinarily we will not consider matters raised for the first time on appeal. However, where a tardily raised constitutional issue involves only a question of law, we have discretion to consider that issue. (*Los Angeles Unified School Dist.* v. *State of California* (1991) 229 Cal.App.3d 552, 555 [280 Cal.Rptr. 237]; *Bayside Timber Co.* v. *Board of Supervisors* (1971) 20 Cal.App.3d 1, 4-5 [97 Cal.Rptr. 431].) ■ Because the issue of section 300, subdivision (b)'s constitutionality is frequently raised, we elect to consider Ziad's contention. On this record we conclude Ziad lacks standing to have such claim heard. (*Valley Forge College* v. *Americans United* (1982) 454 U.S. 464, 471-472 [70 L.Ed.2d 700, 708-709, 102 S.Ct. 752]; *Grove* v. *Mead School Dist. No. 354* (9th Cir. 1985) 753 F.2d 1528, 1531-1532; *Worsley* v. *Municipal Court* (1981) 122 Cal.App.3d 409, 418 [176 Cal.Rptr. 324]; *Ames* v. *City*

[4]We note Ziad remained unrepentant. (*In re Tracy Z.* (1987) 195 Cal.App.3d 107, 113-114 [240 Cal.Rptr. 445].)

[5]We are not persuaded by Ziad's assertions his cultural beliefs and considerations of parental autonomy require the children be left in his custody. "[W]hile parental autonomy is protected by both statute and the Constitution, that autonomy is not absolute. . . . '[T]he state has a right, indeed, a duty, to protect children. [Citation.]' " (*In re Petra B.* (1989) 216 Cal.App.3d 1163, 1171 [265 Cal.Rptr. 342].) Thus, the state may intervene in family matters where necessary to protect the child. (*Ibid.*) Further, section 16509 provides: "Cultural and religious child-rearing practices and beliefs which differ from general community standards shall not in themselves create a need for child welfare services *unless* the practices present a specific danger to the physical or emotional safety of the child." (Italics added.) Even if Ziad's conduct resulted from his cultural beliefs, there was sufficient evidence to conclude such conduct presented a specific danger to his children's physical safety. "Children have a right to care which does not constantly endanger their physical well-being." (*In re Albert B.* (1989) 215 Cal.App.3d 361, 377-378 [263 Cal.Rptr. 694].)

*of Hermosa Beach* (1971) 16 Cal.App.3d 146, 150-151 [93 Cal.Rptr. 786]; Code Civ. Proc., § 526a.)

Section 300, subdivision (b), authorizes the juvenile court to adjudge a minor its dependent where the parent's inability or failure to protect the child creates a substantial risk of serious physical harm to the child. As noted, based upon substantial evidence the juvenile court properly found Ziad's children faced a substantial risk of serious physical harm under section 300, subdivision (b). Ziad does not challenge the constitutionality of the portion of section 300, subdivision (b), under which the juvenile court made its jurisdictional findings. Instead, Ziad challenges the part of section 300, subdivision (b) which provides:

"Whenever it is alleged that a minor comes within the jurisdiction of the court on the basis of the parent's or guardian's willful failure to provide adequate medical treatment or specific decision to provide spiritual treatment through prayer, the court shall give deference to the parent's or guardian's medical treatment, nontreatment, or spiritual treatment through prayer alone in accordance with the tenets and practices of a recognized church or religious denomination, by an accredited practitioner thereof, and shall not assume jurisdiction unless necessary to protect the minor from suffering serious physical harm or illness."

Ziad contends the challenged portion of section 300, subdivision (b), improperly creates two classes of parents—those who injure their children out of a religious belief and those who injure their children for nonreligious reasons. However, the proceedings here were not based upon an allegation Ziad failed to provide the children adequate medical treatment or specifically decided to provide spiritual treatment through prayer. Instead, these proceedings were based upon Ziad's failure or inability to adequately supervise or protect the minors resulting in their suffering (or being at substantial risk of suffering) serious physical harm. Since this case has nothing to do with failure to provide medical treatment, Ziad lacks standing to challenge the statutory deference to treatment by prayer.

The United States Supreme Court "has always required that a litigant have 'standing' to challenge the action sought to be adjudicated in the lawsuit. The term 'standing' subsumes a blend of constitutional requirements and prudential considerations . . . ." (*Valley Forge College* v. *Americans United, supra,* 454 U.S. at p. 471 [70 L.Ed.2d at pp. 708-709.) At a minimum, standing means a party must " 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant,' . . . ." (*Id.* at p. 472 [70 L.Ed.2d at p. 709].) California law is

similar. ■ " '[I]t is well-settled law that the courts will not give their consideration to questions as to the constitutionality of a statute unless such consideration is necessary to the determination of a *real and vital controversy between the litigants in the particular case before it.* It is incumbent upon a party to an action or proceeding who assails a law invoked in the course thereof to show that the provisions of the statute thus assailed are applicable to him and that he is injuriously affected thereby.' [Citations.]" (*Worsley* v. *Municipal Court, supra,* 122 Cal.App.3d at p. 418, italics in original.) ■ Here, Ziad has not demonstrated he suffered any direct injury resulting from the assertedly unconstitutional portion of section 300, subdivision (b). (*Worsley* v. *Municipal Court, supra,* 122 Cal.App.3d at p. 418; *Valley Forge College* v. *Americans United, supra,* 454 U.S. at p. 471 [70 L.Ed.2d at pp. 708-709]; *Grove* v. *Mead School Dist. No. 354, supra,* 753 F.2d at pp. 1531-1532.) Neither has Ziad brought an action as a taxpayer to enjoin an assertedly illegal expenditure of public funds. (*Ames* v. *City of Hermosa Beach, supra,* 16 Cal.App.3d at pp. 150-151; Code Civ. Proc., § 526a.)

In sum, we do not determine the substantive merits of Ziad's claim the challenged portion of section 300, subdivision (b), is unconstitutional.[6] Such determination will be made only if the claim is raised by one with standing. (*Azusa Western, Inc.* v. *City of West Covina* (1975) 45 Cal.App.3d 259, 266 [119 Cal.Rptr. 434].)

### DISPOSITION

The order is affirmed.

Todd, J., and Huffman, J., concurred.

---

[6]The challenged portion of section 300, subdivision (b), is apparently an attempt to accommodate certain religious beliefs. "The United States Supreme Court explained in *County of Allegheny* [*v. American Civil Liberties U.* (1989) 492 U.S. 573 (106 L.Ed.2d 472, 109 S Ct 3086)] that '[g]overnment efforts to accommodate religion are permissible when they *remove burdens* on the free exercise of religion.' (492 U.S. at p. 601, fn. 51 . . . , italics added.)" (*Sands* v. *Morongo Unified School Dist.* (1991) 53 Cal.3d 863, 877 [281 Cal.Rptr. 34, 809 P.2d 809].)