175 Cal.App.4th 300 (2009)
In re HARVEY ZANE JENKINS on Habeas Corpus.
No. C059321.
Court of Appeals of California, Third District.
June 25, 2009.
*305 Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Jessica N. Blonien and Christopher J. Rench, Deputy Attorneys General, for Appellant State of California.
S. Lynne Klein, under appointment by the Court of Appeal, for Respondent Harvey Zane Jenkins.

OPINION
ROBIE, J. 
Because of a transfer from Centinela State Prison to High Desert State Prison and a later transfer between facilities within High Desert, inmate Harvey Zane Jenkins spent more than half a year unassigned to a work, school, or vocational program. As a result, at his next annual classification review, he received only two of the four favorable classification points available for average or above-average performance in such a program.[1]
By way of a habeas corpus petition, Jenkins sought to compel the Department of Corrections and Rehabilitation (the department) to award him the other two work/school performance points because the interruption in his *306 work assignment was the result of a nonadverse transfer.[2] Following In re Player (2007) 146 Cal.App.4th 813 [53 Cal.Rptr.3d 233], the superior court granted Jenkins relief based on the conclusion that because Jenkins was entitled to "S" timei.e., "excused work time for purposes of calculating credit off of [his] sentence" (id. at pp. 827-828)for the time he was not assigned to a work program, he was also entitled to favorable classification points for average or above-average performance in a work, school, or vocational program for his unassigned time as well.
On the prison warden's appeal, we concludefirst of allthat the notice of appeal was timely filed under rule 8.308(a) of the California Rules of Court.[3] As we will explain, under rule 8.308(a), "a notice of appeal ... must be filed within 60 days after the rendition of the judgment or the making of the order being appealed." Where, as here, the order being appealed was not pronounced in open court, but instead was embodied solely in a writing that was prepared, signed, and filed outside the presence of the parties, we conclude "the making of the order" does not occur until the court undertakes to communicate the substance of its order to the parties in some reasonable manner. That occurred here when the court mailed copies of the written order to the parties four days after the order was signed and filed. Because the warden filed his notice of appeal within 60 days of the date of that mailing, the appeal is timely.
Second, we conclude the superior court erred in determining Jenkins was entitled to the additional two work/school performance points for the time he did not actually participate in any work, school, or vocational program. A governing department regulation specifies that "[f]avorable points shall not be granted for average or above average performance for inmates who are not assigned to a program." (Cal. Code Regs., tit. 15, § 3375.4, subd. (a)(3)(B).) Because the department's interpretation and application of that regulation here to deny Jenkins the additional work/school performance points he sought was not arbitrary, capricious, or irrational, the department's decision must be upheld. Accordingly, we will reverse the superior court's order granting Jenkins relief on his habeas corpus petition and direct the court to enter a new order denying relief.

FACTUAL AND PROCEDURAL BACKGROUND
Jenkins is in the custody of the department as a result of his conviction for second degree murder in 1993.
*307 On December 21, 2005, Jenkins was transferred from Centinela State Prison to High Desert. Jenkins was not assigned to a work program at High Desert until January 12, 2006. From January 12 until March 9, he was assigned as "Facility C housing porter." On March 9, he was transferred to facility B, where he spent 172 days without a work assignment. He was subsequently assigned to an educational program.
On October 24, 2006, the annual review of Jenkins's classification score was conducted, covering the period from October 1, 2005, through September 30, 2006. Jenkins received a four-point reduction in his score for having no serious disciplinary actions and a two-point reduction for average or above-average performance in a work, school, or vocational program. It was later explained that Jenkins was denied the additional two work/school performance points that were available for the annual review period because he "was unassigned to a program for roughly half of the total review period."[4]
Jenkins appealed, contending that because his transfer to High Desert was not adverse, he was entitled to a four-point reduction for average or above-average performance in a work, school, or vocational program. His appeal was denied at all administrative levels. On July 25, 2007, he filed a petition for writ of habeas corpus in Lassen County Superior Court. Following In re Player, supra, 146 Cal.App.4th at page 813, the superior court determined that because Jenkins's work-qualifying status was disrupted based on circumstances and department conduct beyond his control, Jenkins was entitled to "not only `S' time, but the accompanying favorable work/behavior points."[5] In an order signed and filed April 25, 2008, the court granted Jenkins's petition and directed the department "to reduce [his] classification score by two points and to thereupon make whatever adjustments to [his] custody designation, program and institution placement as may appear."
The superior court served its order on the parties by mail on April 29, 2008. On June 27, 2008, Tom Felker, the warden of High Desert, filed a notice of appeal pursuant to Penal Code[6] section 1507 and rule 8.388(a).

*308 DISCUSSION

I

Timeliness of Appeal
We begin by addressing whether the notice of appeal was timely. Rule 8.388(a) provides that, with exceptions not applicable here, "rules 8.304-8.368 [the rules for appeals in noncapital criminal cases] ... govern appeals under Penal Code section 1506 or 1507 from orders granting all or part of the relief sought in a petition for writ of habeas corpus." Rule 8.308(a), in turn, provides in relevant part that "[e]xcept ... as otherwise provided by law, a notice of appeal ... must be filed within 60 days after the rendition of the judgment or the making of the order being appealed."
Here, if the 60-day period is calculated from the date the superior court mailed the order (Apr. 29), then the notice of appeal was timely filed. If, on the other hand, the 60-day period is calculated from the date the superior court signed and filed the order (Apr. 25), then the notice of appeal was filed three days too late.
Relying on Conservatorship of Ben C. (2006) 137 Cal.App.4th 689 [40 Cal.Rptr.3d 521] (Ben C.), the warden contends (and Jenkins agrees) the notice of appeal was timely filed because the order granting Jenkins relief was not "made" until April 29, when the court served the order on the parties by mail, and therefore the notice of appeal was filed "within 60 days after ... the making of the order being appealed." Although, as will be seen, we do not entirely agree with the warden's reasoning, we do agree with his conclusion"the making of the order," for purposes of rule 8.308(a), occurred on April 29, when the court undertook to communicate its decision on Jenkins's habeas corpus petition to the parties, and because the warden filed his notice of appeal within 60 days of that date, the appeal is timely.
Because the warden relies primarily on the decision in Ben C., we begin our analysis with that case. In Ben C., a number of conservatees filed petitions for reimbursement of expert costs concerning conservatorship proceedings under the Lanterman-Petris-Short Act.[7] (Ben C., supra, 137 Cal.App.4th at p. 691.) The court took the petitions under submission at a *309 hearing in August 2004. (Id. at p. 694.) On September 22, 2004, the court filed a written decision denying the petitions; however, the court did not mail its decision to or serve its decision on anyone. (Id. at pp. 694, 695.)
In October, the conservatees filed another round of petitions seeking to recover the expert costs, and those petitions were heard in December. (Ben C., supra, 137 Cal.App.4th at p. 694.) At that hearing, the court denied the second set of petitions, "stating [that the court] had previously issued a ruling denying the petitions in September 2004 and that the ruling was in the court file." (Ibid.)
In January 2005, some of the conservatees filed notices of appeal from the September 2004 order denying costs. (Ben C., supra, 137 Cal.App.4th at p. 695.) In determining the notices of appeal were timely, the Court of Appeal first observed that appeals in conservatorship proceedings are governed by the rules applicable to noncapital criminal cases. (Ibid., citing former rule 39(a) [now rule 8.480(a)].) Thus, the critical question was "whether the Conservatees timely filed their notices of appeal within the allotted time [60 days] after the `making of the order' being appealed." (Ben C., at pp. 695, 696.) Relying on this court's decision in In re Markaus V. (1989) 211 Cal.App.3d 1331 [260 Cal.Rptr. 126], the Court of Appeal asserted that "when an order is pronounced in open court, the time to appeal from the order begins to run when the order is pronounced.... [¶] ... Because the order denying the petitions was not made in open court until December 15, 2004, the appeals here are timely." (Ben C., at pp. 695-696, citation omitted.)
Relying on Ben C., the warden argues that "[t]he lack of notice that prevented the running of the time to file the appeal in ... Ben C. is indistinguishable from the lack of notice of the operative order in this case. Here, the superior court issued a written order on Jenkins' petition on April 25, 2008; however, the order was not pronounced in open court, and none of the parties were notified of the decision until the clerk mailed out a copy of the order on April 29, 2008.... Accordingly, as determined in ... Ben C., the April 25, 2008 order was not made for purposes of rule 8.308 and the time for [the warden] to file his appeal did not begin to run until he received reasonable notice of the superior court's ruling, which did not occur until the clerk mailed out a copy of the ruling on April 29, 2008."
The warden's interpretation of Ben C., as turning on "[t]he lack of notice," is not entirely persuasive because the court in Ben C. did not hold, as the warden suggests, that an order is not "made" for purposes of rule 8.308(a) until the parties receive reasonable notice of it. It is true that on its way to determining the notices of appeal were timely, the Court of Appeal in Ben C. observed that "the [trial] court's action of placing its order in the court file *310 [was not] sufficient to have provided reasonable notice to the Conservatees or their attorney of the court's rulings." (Ben C., supra, 137 Cal.App.4th at pp. 695-696.) But that observation stands largely apropos of nothing in the court's opinion. Rather, the fundamental principle on which the decision in Ben C. turned was that "when an order is pronounced in open court, the time to appeal from the order begins to run when the order is pronounced." (Ben C., supra, 137 Cal.App.4th at p. 695.) Thus, the order denying the cost petitions in Ben C. was not "made" until the court pronounced the ruling in open court in December 2004, even though the court had previously prepared a written decision and filed that decision in the court files three months earlier.
Here, as the warden himself admits, "the order [he seeks to appeal] was not pronounced in open court." Under these circumstances, the pertinent question is this: When is an order that is never pronounced in open court "made" for purposes of triggering the 60-day period for filing a notice of appeal under rule 8.308(a)? On that question, Ben C. provides little direct guidance. Accordingly, we turn to Markaus V., the case from this court on which the Ben C. court primarily relied, to see if that case is of more help.
Markaus V. involved an appeal in dependency proceedings brought under Welfare and Institutions Code section 300. (In re Markaus V, supra, 211 Cal.App.3d at p. 1333.) On March 11, 1988, the juvenile court pronounced various orders at a hearing and directed the father's attorney to prepare a formal order. (Id. at pp. 1333-1334.) "On March 16, 1988, the court signed and dated a minute order for the March 11 hearing." (Id. at p. 1334.) On March 29, the court signed and filed the formal order the father's attorney had prepared. (Ibid.) The mother filed her notice of appeal on May 12, 1988. (Ibid.)
In determining the mother's notice of appeal was timely filed, this court first rejected the mother's reliance on several "civil cases where the time to appeal [wa]s governed by [former] rule 2 [now rule 8.104]." (In re Markaus V., supra, 211 Cal.App.3d at pp. 1334-1335.) The court explained under the rule applicable to appeals in civil cases, the time for filing a notice of appeal was tied to the "`entry'" of an order or judgment, but appeals from the juvenile court were governed by former rule 39(b) [now rule 8.400(d)(1)], which "required that a written notice of appeal be filed `within 60 days after the rendition of the judgment or making of the order. ...' (Italics added.)" (Markaus V., at p. 1335.) Thus, the question before the court was "not when the order was `entered' but when it was `made.'" (Ibid.)
*311 In answering that question, this court observed that the language of former rule 39(b) "replicate[d] language in [former] rule 31(a), applicable to criminal appeals" and "`making of the order' must mean the same thing in [both] rules ...." (In re Markaus V., supra, 211 Cal.App.3d at p. 1335.) To determine when an order was "made" for purposes of an appeal under former rule 31(a), the court relied on several factors. First, the court observed that "our Supreme Court has generally begun to count the time to file a notice of appeal from the oral pronouncement of judgment in open court" and had, "[i]n at least one case, ... started the time to appeal from an order denying a motion upon the oral denial in open court." (Markaus V., at p. 1336.) Second, the court observed that "[t]hese applications of [former] rule 31 are in accord with the general rule that, `An order or decree of court takes effect from the time it is pronounced, and the failure of the clerk to file the papers or enter the judgment does not delay or defeat the operation of the court's pronouncement.'" (Ibid.) Third, the court observed that "[t]hese applications are also consistent with the history of [former] rule 31. The crucial language in [former] rule 31(a), stating the time to appeal begins to run from `the rendition of the judgment or the making of the order,' was incorporated into [former] rule 31 from former Penal Code section 1239, subdivision (a), which governed the filing of criminal appeals before the enactment of rule 31 in 1943. Under that statute, a criminal appeal could be taken by `(1) Announcing in open court at the time the judgment is rendered or the order made that an appeal is taken from the same; or [¶] (2) Filing with the clerk of the court a written notice of appeal within five days after the rendition of the judgment or the making of the order, ...' [Citation.] The first procedure clearly would be impossible unless an order was `made' when pronounced in open court. The extremely short time limit under the second procedure points to the same conclusion." (Markaus V., at pp. 1336-1337, fn. omitted.)
Based on these observations, this court concluded "that, as a general rule, under [former] rule 31(a), and hence under [former] rule 39(b), if an order is pronounced in open court, the time to appeal from the order begins to run when the order is pronounced." (In re Markaus V., supra, 211 Cal.App.3d at p. 1337.) The court further concluded, however, that the case before it "present[ed] an exception to the general rule. It has been recognized that where a statute requires a certain form of order, the order is effective only when made in the statutory form.... [¶] Here, the order appealed from was `made' pursuant to the authority of [Welfare and Institutions Code] section 362.4, which authorizes the juvenile court to `issue' an order determining the custody of the child and directs that the order `shall be filed in the proceeding for nullity or dissolution at the time the juvenile court terminates its jurisdiction over the minor, ...' [Citation.] [Welfare and Institutions Code s]ection 362.4 plainly envisions that a written order be `issued' and filed in another action. Section 362.4 does not contemplate that an oral order *312 shall be valid. Consequently, in this case, the juvenile court accomplished the `making' of its order when it `issued' the written order that would also be filed in the marital dissolution action, all in compliance with [Welfare and Institutions Code] section 362.4. That order was the order prepared by counsel and signed and filed on March 29, 1988. [¶] Since the mother's notice of appeal was filed less than 60 days from the `making' of the subject order on March 29, the appeal is timely under [former] rule 39(b)." (Markaus V., at p. 1337.)
(1) Markaus V. stands for the proposition that when an order that is subject to the rules governing noncapital criminal appeals (and other identically phrased rules) is pronounced in open court, then the time for filing a notice of appeal from that order runs from the date of the oral pronouncement, except if a statute (or, presumably, a rule not inconsistent with a statute) requires a certain form of order, in which case the time to appeal runs from the date the order is made in the required form.
Here, as we have observed, the order granting Jenkins relief was not pronounced in open court. Moreover, the statutes (§ 1473 et seq.) and rules (rule 4.550 et seq.) governing habeas corpus proceedings in the superior court do not require a certain form of order. Thus, the pertinent question becomes this: When an order can be oral or written, and the order is not pronounced in open court but instead embodied only in a writing signed and filed by the court, when is that order "made" for purposes of rule 8.308(a)?
Although neither Ben C. nor Markaus V. provides a direct answer to that question, we believe a path to the right answer is illuminated by the Markaus V. court's historical analysis of the rules and statutes from which the operative language in rule 8.308(a) derives.
We go back to the beginning (as near as we can determine). Section 485 of the Criminal Practice Act of 1851 (Stats. 1851, ch. 29, § 485, p. 266) provided that an appeal in a criminal case could be taken within one year after the judgment was rendered; no separate provision was made for an appeal from an order. When the Penal Code was enacted in 1872, such a provision was added, and former section 1239 provided as follows: "An appeal from a judgment must be taken within one year after its rendition, and from an order, within sixty days after it is made."
"In a criminal case, judgment is rendered when the trial court orally pronounces sentence." (People v. Karaman (1992) 4 Cal.4th 335, 344, fn. 9 *313 [14 Cal.Rptr.2d 801, 842 P.2d 100].) Thus, generally speaking, the time to appeal from a judgment in a criminal case has always run from the time the court renders that judgment by orally communicating the sentence to the partiesparticularly the defendant, who (again, generally speaking) has a right to be present (see §§ 977, subd. (b), 1193; Cal. Const., art. I, § 15). On this point, it is significant to note that the words "pronounce" and "render" both of which are routinely used to describe what a trial court does with a judgment in a criminal caseinclude a fundamental element of communication. (See Merriam-Webster's Collegiate Dict. (11th ed. 2006) pp. 995, 1054 [to "pronounce" is "to declare officially or ceremoniously" to "render" is "to furnish for consideration ... or information: as (1): to hand down (a legal judgment)"].)
The word "make," by itself, does not necessarily convey a similar element of communication, inasmuch as it can mean simply "to bring into being." (Merriam-Webster's Collegiate Dict., supra, at p. 750.) Under this definition, a court could be understood to "make" a written order when it prepares the order, regardless of when or whether it communicates the substance of that order to anyone. As we will explain, however, we do not believe this is a reasonable construction of the word "make" in this context.
Since 1872, when a specific provision was first added to the law to address the timing of appeals from orders in criminal cases, California law has not distinguished between written orders and oral orders with respect to when the time to appeal begins to run. As with a judgment (which is always oral), the time to appeal from an order in a criminal case that is orally communicated to the parties runs from the time of the oral communication. That is when the order is "made." Treating written orders differently, by determining that a written order is "made" when the court creates itregardless of when the court communicates the substance of the order to the partieswould put written orders on different footing than oral orders without any legitimate basis for doing so.
At this point, it is important to remember that we are construing the word "make" specifically in the context of "making an order." An order is "a specific ... authoritative direction: COMMAND." (Merriam-Webster's Collegiate Dict., supra, at p. 873; cf. Code Civ. Proc., § 1003 [an order is a "direction of a court or judge"].) Thus, while the word "make" alone does not necessarily convey an element of communication, the phrase "making an order" does. Because an order is a direction or command to one or both of the parties, it cannot reasonably be said to have been "made" until it is communicated.
*314 (2) Where (as here) the direction is embodied in a writing, and is not communicated to the parties orally, it is not essential to the concept of "making an order" that the parties must have first received the writing before the order is deemed "made." Rather, it suffices that the court has undertaken, in some reasonable manner, to communicate its direction to the parties. Construing the law in this manner creates something of a parallel to the rule governing the time for filing a notice of appeal in civil cases, where the time generally begins to run when a party serves, or the court clerk mails, a file-stamped copy of the judgment or a formal "`Notice of Entry'" of judgment. (Rule 8.104(a).)
Applying the foregoing reasoning here, "the making of the order being appealed," within the meaning of rule 8.308(a), did not occur on April 25, when the court signed and filed the written order, but four days later on April 29, when the court first endeavored to communicate the substance of its order to the parties by placing copies of the written order in the mail to them. Thus, the warden's notice of appeal, filed on June 27, fell within the 60 days allowed and was timely.
As we close on this point, it is worth noting that this construction of rule 8.308(a) will ensure the fair treatment of parties like the warden in appeals from orders granting relief on habeas corpus petitions. Because the statutes and rules governing such proceedings (§ 1473 et seq.; rule 4.550 et seq.) do not require that the superior court hold a hearing at which the parties will be present, relief likely is often granted by means of a written order without any oral pronouncement. Concluding that the time for filing an appeal does not begin to run until the court undertakes to communicate the substance of its written order to the parties will eliminate the possibility that the time for appealing could run substantially or entirely before the parties ever learn that the court has ruled on the habeas corpus petition.

II

Calculation of Jenkins's Classification Score
Turning to the merits, this case involves an issue of inmate classification. Accordingly, before proceeding, we pause to note the standard of review that applies to such cases.
(3) "The Legislature has given the Director of the Department ... broad authority for the discipline and classification of persons confined in state *315 prisons. (Pen. Code, §§ 5054, 5068.) This authority includes the mandate to promulgate regulations governing administration, classification and discipline." (In re Lusero (1992) 4 Cal.App.4th 572, 575 [5 Cal.Rptr.2d 729].) "`Prison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'" (In re Wilson (1988) 202 Cal.App.3d 661, 667 [249 Cal.Rptr. 36].) Accordingly, in reviewing classification decisions such as the one at issue here, we must uphold the department's decision as long as it is supported by "`some evidence.'" (Id. at pp. 666-667; see also In re Player, supra, 146 Cal.App.4th at p. 824.) "This deference ... limits judicial intervention to demonstrated instances of actions by prison officials that are arbitrary, capricious, irrational, or an abuse of the discretion granted those given the responsibility for operating prisons." (Wilson, at p. 667.)
Framed in light of the standard of review set forth above, the question here is whether the department's denial of two additional work/school performance points to Jenkins because he was not assigned to a work, school, or vocational program for more than half of the total review period was arbitrary, capricious, or irrational. We conclude it was not.
(4) An inmate's classification score "impacts on the inmate's custody level and privileges within the prison system." (In re Player, supra, 146 Cal.App.4th at p. 823.) "As a general rule, a prisoner's classification score is directly proportional to the level of security needed to house the inmate. For example, prisoners with high classification scores will be sent to the prisons with higher levels of security." (In re Richards (1993) 16 Cal.App.4th 93, 95, fn. 1 [19 Cal.Rptr.2d 797].)
Under the governing regulations, each inmate's classification score is reviewed at least annually. (Cal. Code Regs., tit. 15, § 3375.4, subd. (a).) "For an annual reclassification review, two six-month periods may be counted. When an inmate's status is interrupted during the period without inmate fault, the period shall be considered continuous." (Ibid.) Under California Code of Regulations, title 15, section 3375.4, subdivision (a)(2), an inmate is entitled to two favorable points (that is, points that are subtracted from the classification score) "[f]or each six-month period since the last review with no serious disciplinary(s)." Under California Code of Regulations, title 15, section 3375.4, subdivision (a)(3), an inmate is also entitled to two favorable points "[f]or each six-month period with an average or above performance in [a] work, school or vocational program." This latter rule is subject to two qualifications. First, "Part-time assignments which when work/program hours *316 are added together are equivalent to a full-time assignment shall be combined." (Id., § 3375.4, subd. (a)(3)(A).) Second, "Favorable points shall not be granted for average or above average performance for inmates who are not assigned to a program." (Id., § 3375.4, subd. (a)(3)(B).)
Here, Jenkins was reviewed on October 24, 2006, for "a period from: 10/01/05 to 09/30/06," which consisted of two "Full Review Periods": October 1, 2005, to March 31, 2006, and April 1, 2006, to September 30, 2006. He received two favorable points for average or above-average performance in a work, school, or vocational program. In his administrative appeal, it was explained that he did "not qualify for the additional two points of classification score reduction" for work/school performance points because he "did not receive an assignment until 22 days after [his] arrival [at High Desert], and [because of] the additional break of 172 days" once he was there.
In the trial court, one of the correctional counselors who conducted Jenkins's annual review attested that Jenkins received two work/school performance points based on his performance "during roughly half of the total review period." The counselor further attested that Jenkins did not receive the additional two work/school performance points, not "because of [his] transfers or because he was unassigned to a program at the beginning of the review period," but "because [he] was unassigned to a program for roughly half of the total review period."
Because the trial court's decision, which the warden challenges in this appeal, relied on the decision of Division One of the Fourth Appellate District in Player, we first consider that decision before we address the warden's arguments.
At issue in Player was the provision in California Code of Regulations, title 15, section 3375.4, subdivision (a), which provides that "[w]hen an inmate's status is interrupted during the period without inmate fault, the period shall be considered continuous." Player had been denied favorable points for average or above-average work performance for three six-month segments of time on three different annual classification reviews because he "admittedly was not participating in a qualified work or training assignment at the beginning of each of the challenged six-month periods," even though the nonparticipation was not his fault.[8] (In re Player, supra, 146 Cal.App.4th at pp. 824-825.) In support of its position that Player was not entitled to favorable points for the *317 periods in question, the department "construe[d] [California Code of Regulations, title 15,] section 3375.4, subdivision (a) as providing a clean slate for each six-month period included in a yearly AR [annual review]." (Player, at p. 825.) Under its construction of the administrative regulation, the department "calculate[d] favorable points for each six-month period of an AR separately, and if, for any reason, an inmate [wa]s not in a credit-qualifying work assignment at the inception of a six-month period in an AR, the [department would] not grant the inmate points for that segment, claiming `continuous' only refers to the six-month period in which a no-fault interruption occurs regardless of whether that interruption caused the inmate not to be in a qualifying assignment during the other six-month period under review." (Id. at p. 826.)
The Court of Appeal determined that it was "called upon to decide whether [the department]'s interpretation of the `period' considered `continuous' for the AR in subdivision (a) of section 3375.4, as only the six-month segment of the year that is interrupted for purposes of awarding favorable average or above performance work points[], is rational." (In re Player, supra, 146 Cal.App.4th at p. 825.) The court determined the answer to that question was "no." (Id. at pp. 826-830.) First, the court concluded that "the plain language of [California Code of Regulations, title 15,] section 3375.4, subdivision (a), [regarding what period is to be considered continuous] refers to the period of the review, which, in most cases, is one year, comprised of two six-month periods, and that if such one-year period is interrupted through no fault of the inmate, the entire period is considered `continuous' for that AR." (Player, at p. 826.)
Secondand more importantly for purposes of this casethe court relied on the fact that the department had granted Player "S" time for the disputed six-month periods. (In re Player, supra, 146 Cal.App.4th at pp. 827-828.) The court explained that while "worktime credits, which reduce an inmate's sentence, are different from favorable points/credits for average or above average performance in that work, they are interrelated. [Citations.] Both types of incentives to reward an inmate's work/school behavior or performance depend upon the inmate's status as assigned to a credit-qualifying work, school or program." (Id. at p. 827.) In the court's view, it was not "logical or fair to deny Player the favorable behavior points for each respective six-month period at issue in this case ... where his credit-qualifying assignments were disrupted or changed due respectively to an adverse transfer which was subsequently vindicated ... and a nonadverse transfer. To find otherwise would deprive Player of the favorable points he *318 would have earned during those `continuous' periods if he had been left in the assignment status he was in before it was changed to unassigned by the actions of the [department]." (Id. at p. 828, fn. omitted.)
The court concluded that "[t]o deny [favorable] points/credits by adopting the [department]'s interpretation of the period to be considered continuous for a nonfault interrupted AR, is to create a perpetual `Catch-22' situation in those cases where an inmate is unassigned in the other six-month period of an AR due to the continuing effect of an interruption beyond the inmate's control." (In re Player, supra, 146 Cal.App.4th at p. 829.) In Player's situation, it was "unreasonable and unfair" to "grant [him] favorable performance credits for one six-month period" where his work assignment was interrupted due to no fault of his own, but "deny [those credits] for the other six-month period of those respective AR's that were directly affected by such interruptions." (Ibid.)
With this understanding of Player, we turn back to the case before us. On appeal, the warden argues that contrary to the appellate court's conclusion in Player, it is not arbitrary or capricious for the department to treat work/school performance points differently than worktime credits. The warden points out that under the department's regulations, work/school performance points "shall not be granted for average or above average performance for inmates who are not assigned to a program." (Cal. Code Regs., tit. 15, § 3375.4, subd. (a)(3)(B).) The warden contends "[a]ctual performance in a program provides [the department] a basis to evaluate whether an inmate is a lesser security risk," justifying a reduction in the inmate's classification score, and "reducing a classification score without documented evidence of adequate performance is speculative." Worktime credits, on the other hand, serve as an incentive for inmates to participate in rehabilitative programs, and documented evidence of actual performance in those programs is not necessary for worktime credits to serve their intended purpose.
We find the warden's argument persuasive. It is true the Player court acknowledged a difference between worktime credits and work/school performance points (In re Player, supra, 146 Cal.App.4th at p. 827), but we believe the Player court did not adequately articulate the extent of that difference. To explain our view on the matter, we begin by providing some background on worktime credits.
(5) Before 1983, "a state prisoner could reduce his term of confinement by only one-third by earning credits for good behavior and program participation, referred to collectively as `conduct credits.'" (In re Reina (1985) 171 *319 Cal.App.3d 638, 643 [217 Cal.Rptr. 535].) Effective January 1, 1983, however, the Legislature substantially revised "the scheme by which prisoners earn and forfeit conduct credits." (Ibid.) Part of that revision was section 2933 (see Stats. 1982, ch. 1234, § 4, p. 4551), under which prisoners can earn one-for-one "worktime" credits for "performance in work assignments and performance in elementary, high school, or vocational education programs." (§ 2933, subd. (a).) "The purpose of the statute is to provide incentive for inmates to participate in one of the educational or work programs designed to develop job skills and work ethics." (Reina, at p. 644.)
Under the terms of section 2933, however, actual work or school performance is not a prerequisite to earning worktime credits. Subdivision (b) of the statute provides that "[w]orktime credit must be earned ...," but subdivision (a) provides that a prisoner is entitled to at least some worktime credits even if he does not actually work or participate in a program, as long as the prisoner is "willing to participate in a full-time credit qualifying assignment."[9] Consistent with this legislative dictate, department regulations provide for inmates to earn worktime credits for time not actually worked (what has been referred to as "S" time) in a variety of circumstances. (Cal. Code Regs., tit. 15, § 3045.3.)
(6) With the understanding that worktime credits can be "earned" just by being willing to participate in a full-time work, school, or vocational program, the Player court was mistaken when it asserted that worktime credits, like work/school performance points, "reward an inmate's work/school behavior or performance" and that worktime credits, like work/school performance points, "depend upon the inmate's status as assigned to a credit-qualifying work, school or program." (In re Player, supra, 146 Cal.App.4th at p. 827.) Neither of these assertions is true with respect to worktime credits. Because worktime credits are earned for the mere willingness to participate in a credit-qualifying program, they do not depend on actual assignment to such a program and they do not reward actual performance in such a program. We recognize that a prisoner can earn more worktime credits by being assigned to and participating in a credit-qualifying program, but the basic right to some worktime credits turns solely on willingness to participate.
Work/school performance points applied in determining an inmate's classification score are entirely different. Under the governing regulations, such *320 points are awarded for "average or above performance in [a] work, school or vocational program" and they "shall not be granted ... for inmates who are not assigned to a program." (Cal. Code Regs., tit. 15, § 3375.4, subd. (a)(3), (a)(3)(B), italics added.) Thus, in contrast to worktime credits, work/school performance points do depend on actual assignment to a qualifying program and do reward actual performance in such a program, namely, performance that is average or better.
Moreover, we agree with the warden that the distinction between worktime credits and work/school performance points in this regard is not arbitrary, capricious, or irrational. The department could have rationally determined that an inmate who performs at average or above-average level in a work, school, or vocational program requires less security than an inmate who performs below average or who has not demonstrated any performance in such a program. Thus, there is a rational basis for the department's regulation that denies work/school performance points to inmates who are not assigned to a program, regardless of whether the lack of an assignment is attributable to the inmate or to the department.
Jenkins objects to us considering the warden's assertion that an inmate who performs at average or above-average level in a work, school, or vocational program requires less security than other inmates. He objects because the warden did not make the argument in the trial court and considering this argument would "place this court in a position of making determinations of fact." We disagree with the latter assertion and decline to find that the warden forfeited this argument by not raising it in the trial court. The proposition that, as a general matter, an inmate who performs at average or above-average level in a work, school, or vocational program requires less security than other inmates is not a question of historical fact that had to be determined based on evidence presented in this case. Thus, we do not become the trier of fact by considering that proposition on appeal. Moreover, while points not raised in the trial court are often deemed forfeited, it is not inevitably so. The fundamental principle that governs any claim of forfeiture is fairness. Thus, for example, where it is deemed "unfair to the trial court and the adverse party to give appellate consideration to an alleged ... defect which could have been presented to, and may well have been cured by, the trial court," forfeiture may be found. (Steve J. v. Superior Court (1995) 35 Cal.App.4th 798, 810-811 [41 Cal.Rptr.2d 731].) But notwithstanding "the general rule that appellate courts will not ordinarily consider matters raised for the first time on appeal," "[t]here are many situations where appellate courts will consider such matters. They will often be considered where the issue relates to questions of law only. [Citations.] Appellate courts are more inclined to consider such tardily raised legal issues where the public interest or public policy is involved. [Citation.] And whether the rule shall be applied *321 is largely a question of the appellate court's discretion." (Bayside Timber Co. v. Board of Supervisors (1971) 20 Cal.App.3d 1, 4-5 [97 Cal.Rptr. 431].)
Here, we do not perceive any unfairness in allowing the warden to explain for the first time on appeal the rational basis he claims supports the department's regulation that inmates who are not assigned to programs are not entitled to work/school performance points. Accordingly, we decline Jenkins's invitation to find the point forfeited.
Turning to the merits of the warden's argument, Jenkins asserts that it "overlooks two important points." First, he states that "a prisoner who is unassigned to work is not free to do as he wishes" and, because serious disciplinary problems will impact negatively on an inmate's classification score, "[a]ny undeserved favorable work time classification credits will be offset by unfavorable classification points received for engaging in misconduct."
(7) The fact that an inmate may be denied favorable classification points for serious disciplinary issues (Cal. Code Regs., tit. 15, § 3375.4, subd. (a)(2)) has no bearing on whether that inmate should be granted favorable classification points for average or above-average performance in a work, school, or vocational program when that inmate is not assigned to, let alone participating in, such a program. In fact, Jenkins's recognition that such points would be "undeserved" only tends to establish the point the warden seeks to makethat there is a rational basis for restricting work/school performance points to those inmates who actually participate in work and/or school.
(8) Jenkins's second point is that the warden's argument "overlooks the policy of the California Legislature to award a prisoner, who is willing to participate in a full-time credit qualifying assignment but who is not assigned, work time custody credit." However, as we have explained, there is a fundamental difference between worktime credits and work/school performance points in this regard. Because worktime credits are earned based on the mere willingness to participate, actual assignment and performance are not significant in awarding those credits. But assignment and performance are central to work/school performance points, because without a work/school assignment, there can be no work/school performance points, and without any such performance, there is no basis to assess the quality of that performance as average or above.
(9) Jenkins contends that treating worktime credits and work/school performance points differently in this way "leads to the unreasonable result that [an inmate's] prison sentence itself will be reduced because he is willing *322 to participate [citations] but his security risk as reflected in his classification score will be unaffected." There is nothing unreasonable about this result. By enacting section 2933, the Legislature has determined that an inmate's mere willingness to work or go to school should be rewarded with time off the inmate's sentence. As a basis for this determination, the Legislature need not have decided that an inmate who wants to work or go to school poses a reduced risk to society and therefore should be released earlier than another inmate who wants to do neither. Rather, the Legislature simply could have decided that work and school programs have a beneficial rehabilitative effect on inmates, and offering custody credits for the willingness to participate in such programs is a rational and justifiable way to encourage inmates to move toward rehabilitation.
On the other hand, in the absence of any guiding authority from the Legislature,[10] the department could have rationally determined that actual average or above-average performance in a work, school, or vocational programversus a mere willingness to participate in such a programis necessary to show that an inmate poses a reduced security risk such that his security classification should be reduced. Viewed from this perspective, the different treatment of worktime credits and work/school performance points is plainly not irrational. Stated another way, just because the Legislature decided an inmate should get time off his sentence for being willing to participate in a work or school program does not mean the department was bound to decide that the same inmate poses a lesser security risk while in prison because of that same willingness.
(10) In summary, we conclude the warden has demonstrated that the regulation restricting work/school performance points to those inmates who are actually participating in a qualifying program and are performing at average or above-average level in that program has a rational basis. Moreover, we conclude the application of that regulation to deny Jenkins two of the possible four work/school performance points he could have earned for the annual review period, based on the fact that he was unassigned to a program for more than half of that period, was rational as well. Consequently, the superior court erred in granting Jenkins relief on his habeas corpus petition.

*323 DISPOSITION
The order filed April 25, 2008, granting relief on Jenkins's habeas corpus petition is reversed, and the case is remanded to the superior court with instructions to enter a new order denying relief.
Scotland, P. J., and Cantil-Sakauye, J., concurred.
NOTES
[1] For ease of reference, we will refer to the favorable classification points that are available under section 3375.4, subdivision (a)(3) of title 15 of the California Code of Regulations for "average or above performance in [a] work, school or vocational program" as work/school performance points.
[2] Jenkins focused on his initial transfer between prisons and did not mention his later transfer between facilities within High Desert. The department's response made clear, however, that the time Jenkins was unassigned during the period under review was attributable to both transfers.
[3] All further rule references are to these rules.
[4] During the first half of the annual review period, which ran from October 1, 2005, through March 31, 2006, it appears Jenkins was assigned to a program for 138 days and unassigned for 44 days. During the second half of the annual review period, from April 1, 2006, to September 30, 2006, it appears Jenkins was assigned to a program for 33 days and unassigned for 150 days. Therefore, in total, for the entire review period, Jenkins was assigned for 171 days and unassigned for 194 days.
[5] Jenkins's entitlement to "S" time is not at issue in this appeal because the warden "does not contest the superior court's determination that Jenkins was entitled to `S' time for the time in question."
[6] Penal Code section 1507 provides that "[w]here an application for a writ of habeas corpus has been made by or on behalf of any person other than a defendant in a criminal case, an appeal may be taken to the court of appeal from a final order of a superior court granting all or any part of the relief sought ...." In contrast, Penal Code section 1506 authorizes an appeal by the People from an order granting relief sought in a habeas corpus petition by a defendant in a noncapital criminal case. For our purposes, it does not matter which of these statutes governs the warden's appeal.

All further statutory references are to the Penal Code unless otherwise indicated.
[7] Welfare and Institutions Code section 5000 et seq.
[8] In the first two instances, Player's work assignment was suspended because he was sentenced to serve a term in the security housing unit based on a finding that he had conspired to assault a member of the prison staffa finding that was later vacated. (In re Player, supra, 146 Cal.App.4th at pp. 817, 825.) In the third instance, Player's assignment was interrupted due to his placement in administrative segregation as the result of an enemy concern, which was followed by his transfer to another prison and then a temporary trip to testify as a witness. (Id. at pp. 818, 825.)
[9] One-to-one worktime credits are provided "for performance in work assignments and performance in elementary, high school, or vocational education programs." (§ 2933, subd. (a).) "Enrollment in a two- or four-year college program leading to a degree" earns one day of credit for every two of participation. (Ibid.; see § 2931.) Similarly, "every prisoner willing to participate in a full-time credit qualifying assignment but who is either not assigned to a full-time assignment or is assigned to a program for less than full time" is entitled to no less than one-to-two worktime credits. (§ 2933, subd. (a); see § 2931.)
[10] Jenkins recognizes that the Legislature has granted the department the discretion to determine how, and on what factors, it classifies inmates. (See § 5068.)